88 So.2d 875

**DAVENPORT–HARRIS FUNERAL HOME, Inc.,**

v.

**Glenn CHANDLER et al.**

6 Div. 905.

Court of Appeals of Alabama.

March 6, 1956.

Rehearing Denied May 8, 1956.

Arthur D. Shores, Birmingham, for appellant.

Norman E. Moon, McDonald & Moon, Birmingham, for appellees.

PRICE, Judge.

This is an appeal from final judgments rendered in behalf of both appellees, plaintiffs below, by the Circuit Court of Jefferson County. Two actions are involved, one by Glenn Chandler, a minor, for personal injuries and property damage, and the other by John H. Chandler for medical expense and loss of services of his minor son. The actions were, by agreement, consolidated both in the trial court and on appeal.

On July 24, 1952, a collision occurred at the intersection of 80th Street and 5th Avenue North in the City of Birmingham between a motorcycle operated by appellee Glenn Chandler and a 1947 Buick automobile, which was the lead car in a funeral procession and was being driven at the time by one John Patterson.

The evidence is undisputed that appellant, Davenport-Harris Funeral Home, Inc., had charge of and was conducting the funeral of one Jim Clark. The Masonic Order to which deceased had belonged held a ceremony in the church and the pall bearers were all members of the Masonic Order. After the conclusion of the ceremony in the church it was discovered there was no automobile available for the use of the pall bearers. The Minister granted permission for his car to be used for this purpose but declined to drive it. John Patterson, who was not attending the funeral, but was merely passing the church on his way home from work consented to drive the automobile.

The sole question presented here is whether the court erred in overruling appellant's motion for a new trial on the ground that the evidence was insufficient to show the relation of principal and agent or master and servant between the Daven-port-Harris Funeral Home, Inc., and the said John Patterson.

The evidence which in any wise bears on this question is as follows:

For the plaintiffs, Nubon Hall testified he was a Mason and was a pall bearer. Some of the Masons spoke to Reverend Croskey about using his car and some of the Masons also asked Patterson to drive it. The man who was driving the hearse for Davenport-Harris told Patterson, "You go in front and you blow at every intersection." The preacher rode in the hearse with the driver. The director lined up the cars and told the drivers what position to take and he asked Patterson to take the lead. Recalled for further cross-examination, the witness stated that Brother Womack, one of the Masons, suggested that the preacher be asked for the use of his car, but that the funeral director asked the preacher for the car and that he also asked Patterson to drive it.

Asberry Croskey testified he was the Minister who preached the funeral service and that he was also a Mason. At the close of the religious rites he turned the service over to the funeral director and the director called the pall bearers and they took the body to the hearse. When the funeral director began lining up the cars he found there was none for the pall bearers. He asked if either of the pall bearers had a car and they told him no, but that Preacher Croskey had one. The director asked witness if his car could be used, and he told him they could use it in case of necessity but that witness had no driver's license. Several others of the Masons said they did not have a driver's license. Patterson was passing and Womack stopped him and asked him to drive and Patterson consented to do so. The hearse driver and Patterson walked with witness to where the car was parked. The hearse driver told Patterson to lead the procession, turn on his lights, blow his horn at all intersections and stop signs and to keep going. Witness said that Daven-

port-Harris did not pay him nor promise to pay for the use of the car.

John Patterson testified he was not a member of the funeral party. At the time he was asked to drive the automobile the body was already in the hearse. So far as he knew there was no representative of the funeral home present, other than the driver of the hearse. The hearse driver told him to turn the lights on and to blow his horn at intersections and at traffic signals, but that funeral processions were not required to stop at stop signs or red lights.

For the defendant William Sterling, the manager of Davenport-Harris Funeral Home, Inc., stated it was his duty as manager to make funeral arrangements, do all the buying, hiring, and firing, and to schedule funerals. He testified James L. Farmer was the hearse driver at this particular funeral; Farmer is no longer an employee of the company but is in business for himself in Rome, Georgia. All the arrangements for the funeral were made at the company's office. Farmer's instructions were given to him before he left the funeral home. Farmer had no authority to hire anybody and he was not authorized to use Croskey's car nor to hire John Patterson to drive it. On cross-examination the witness testified that Farmer was in charge of the funeral from the funeral home to the church and had orders to drive the hearse to the cemetery. None of the employees of the funeral home act as pall bearers. It is the duty of the funeral director to pull the body out of the hearse and the pall bearers then handle it. The company aided in putting the family in the family cars and was responsible only for the family but was not necessarily responsible for the pall bearers. The company does not provide transportation for the preacher but Farmer could let him ride in the hearse if he wanted to. On cross-examination the witness stated the company supplies cars for the family only where the family pays for them and if the family has "friends or anybody else at the church that wants to get to the cemetery that is up to them."

The general rule is, "While ordinarily a subordinate servant has no power to employ or discharge assistance, so as to render the master liable for their acts, * * a master is liable for the acts of one whom the servant employs, under authority given him by the master, to assist in the performance of the master's work. The authority to employ assistants may be either express or implied; it may be implied from the nature or extent of the work to be performed, from the circumstances of the particular case, from the general course of conducting the business of the master by the servant. * * *" 57 C.J.S., Master and Servant, § 564a; Harris v. Bell, 234 Ala. 679, 176 So. 469.

■ "Where there is neither express nor implied authority given a servant to employ another to perform or to assist him in the performance of his work, or a subsequent ratification by his employer of such employment, the relation of master and servant between the employer and one so employed by his servant does not exist and he is not liable for the negligent acts of the latter under the doctrine of respondeat superior." 57 C.J.S., Master and Servant, § 564b; Emison v. Wylam Ice Cream Co., 215 Ala. 504, 111 So. 216.

In the annotation 25 A.L.R.2d 985, "Assistant employed without authority" it is stated: "According to general common law principles a defendant can be held for the tort of another under the rule respondeat superior only upon proof that the person who committed the tort was acting for him with his authority or with that of someone authorized by him to employ such person.

"Under this broad principle strictly applied, an employer is not liable for the negligence of one whom his employee procures or permits to assist in the work without proof that the employee had authority from the employer to procure or permit the assistance. Haluptzok v. Great Northern Ry. Co. (1893) 55 Minn. 446, 57 N.W. 144, 26 L.R.A. 739. The paucity of nineteenth century cases on the point would

seem to be due to the elementary nature of the proposition and the constant acceptance of it as such in the trial courts."

As respects the express authority of Farmer to employ assistants, the testimony of the manager of the funeral home is not contradicted, and there is an entire absence of evidence tending to show any such implied authority.

It is said in Motor Terminal & Transportation Co. v. Simmons, 28 Ala.App. 190, 180 So. 597, 599: "The general rule is that to constitute the relationship between master and servant for the purpose of fixing liability on the former for the acts of the latter under the doctrine of respondeat superior, it is indispensable that the right to select the person claimed to be a servant should exist. Furthermore, something more than the mere right of selection is essential to the relation. This right must be accompanied with the power and duty to control the alleged servant while in his employ; this, it is said, is one of the principal tests of the relation. If workmen do not stand in such relation to the person sought to be charged as to make it his duty to control them, they are not servants, and he is in no sense responsible for their acts under the doctrine of respondeat superior. 39 Corpus Juris 1269."

■ Applying the rules above enunciated to the facts in this case, it is our opinion the evidence was insufficient to establish the relation of master and servant between the appellant and John Patterson. The motion for a new trial should have been granted.

Reversed and remanded.

## On Motion for Rehearing.

Counsel for appellees insists that an incident occurring en route to the cemetery, testified to by Asberry Croskey, shows that "Farmer was attempting to enforce and carry out the earlier instructions he had given Patterson with regard to stopping at stop signs and intersections." At counsel's request this portion of Croskey's testimony is set out herein. The witness, as did some of the others, refers to John Patterson as "Sam."

"Q. I believe you testified on direct examination that Sam did stop at one red light near the Chicago Bridge, and that the ambulance driver got out of his car— A. No, sir, he didn't.

"Q. What did he do? A. He began blowing his horn, and after he blew it three or four times, and the car didn't proceed, he started to pull around Wiley Womack.

"Q. He started to pull around? A. Yes, sir.

"Q. Did he pull around? A. He pulled by the side of Wiley Womack's car and—

"Q. The middle of the car? A. Yes, sir.

"Q. And then what happened? A. Sam began driving on off.

"Q. Did he make any statement to Sam at that time? A. No, sir, he asked me a question.

"Q. What did he ask you? A. He asked me why did Sam stop.

"Q. He asked you and not Sam? A. Yes, sir.

"2. You didn't testify that he asked why—asked Sam why he stopped. A. No."

We are unable to agree with counsel's contention that this testimony contradicts the manager of the Funeral Home as to Farmer's lack of authority to employ assistants, or that Farmer's actions in this instance "would not be in keeping with appellant's contention that Farmer had no such authority."

Application overruled.