On March 25, 1993, Deborah Bagley; her daughters, Necole[1] and Brittney *Page 303 
Bagley; Necole's grandmother, Evelyn Boglin; and Deborah's friend, Ronnie Lockett (hereinafter collectively referred to as "the Bagleys"), sued Mazda Motor Corporation ("Mazda") and Creekside Motors, Inc. ("Creekside"), seeking damages under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") on claims alleging breach of warranty and negligence. On December 2, 1997, the Bagleys amended their complaint to allege fraud against Creekside in the sale of a vehicle. Creekside moved for a partial summary judgment as to the fraud claim. The court entered a partial summary judgment for Creekside on the fraud claim and certified it as final pursuant to Rule 54(b), Ala.R.Civ.P. All claims against Mazda and the claims first asserted against Creekside remained pending. On May 21, 1998, the trial court entered an amended order to explain that "[t]he Order of 5/11/98 is amended to show [that] the Summary Judgment for Defendant Creekside Motors, Inc. is granted only as to the fraud count in the Amended Complaint." On July 14, 1998, the trial court entered an "Amended Order Nunc Pro Tunc," again granting Creekside's motion for a summary judgment as to the fraud claim, and again certifying the partial summary judgment as final pursuant to Rule 54(b), Ala.R.Civ.P.
After Creekside and Mazda filed motions to exclude the testimony of David Brown, a metallurgical engineer and the Bagleys' expert witness, and motions for a summary judgment as to the Bagleys' remaining claims against each of them, the trial court entered an order excluding Brown's testimony and entering a summary judgment for Creekside as to all of the Bagleys' remaining claims. The order stated, in pertinent part:
 "The motion for a summary judgment filed by the Defendant Creekside Motors, Inc., is argued and responded to by the [Bagleys]. The Court finds that summary judgment is due to be granted and hereby enters the same. The Court finds that the expert testimony of David Brown should be excluded. Mazda's motion for a summary judgment is denied."
On March 13, 2002, Mazda filed a motion requesting that the trial court alter or amend its order denying Mazda's motion for a summary judgment. In response to Mazda's motion, which the Bagleys state in their brief "was unopposed so that the matters contained [in their brief] might be addressed by the appellate court," the trial court set aside its earlier order denying Mazda's motion for a summary judgment, and entered a summary judgment in its favor. The Bagleys filed a notice of appeal on April 29, 2002; approximately two weeks later, they filed an amended notice of appeal.
The Bagleys argue five issues on appeal:
 "(I) Whether or not it was error for the trial court to apply Daubert v. Merrell Dow Pharmaceuticals, Inc., [509 U.S. 579 (1993),] to disqualify [the Bagleys'] expert witness, Mr. David Brown, a metallurgical engineer.
 "(II) Whether or not it was error for the court to grant summary judgment in favor of Creekside, seller, and Mazda, manufacturer, on [the Bagleys'] AEMLD claim.
 "(III) Whether the trial court erred in granting summary judgment in regard to the AEMLD claim against Creekside.
 "(IV) Whether the trial court erred in granting summary judgment for Creekside on breach of warranty. *Page 304 
 "(V) Whether the trial court erred in granting Creekside's summary judgment with regard to [the Bagleys'] fraud claim."
Our review of an order excluding expert testimony is guided by this principle: "'[W]hether a particular witness will be allowed to testify as an expert is left to the sound discretion of the trial court, whose decision will not be disturbed on appeal except for abuse of that discretion.' Townsend v. General Motors Corp., 642 So.2d 411, 423 (Ala. 1994)." Ammons v. Massey-Ferguson, Inc., 663 So.2d 961, 962 (Ala 1995) (Houston, J., concurring specially).
Our review of a summary judgment is de novo.
 "In reviewing the disposition of a motion for summary judgment, `we utilize the same standard as the trial court in determining whether the evidence before [it] made out a genuine issue of material fact,' Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala. 1988), and whether the movant was `entitled to a judgment as a matter of law.' Wright v. Wright, 654 So.2d 542 (Ala. 1995); Rule 56(c), Ala.R.Civ.P. When the movant makes a prima facie showing that there is no genuine issue of material fact, the burden shifts to the nonmovant to present substantial evidence creating such an issue. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala. 1989). Evidence is `substantial' if it is of `such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.' Wright, 654 So.2d at 543 (quoting West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala. 1989)). Our review is further subject to the caveat that this Court must review the record in a light most favorable to the nonmovant and must resolve all reasonable doubts against the movant. Wilma Corp. v. Fleming Foods of Alabama, Inc., 613 So.2d 359 (Ala. 1993) [overruled on other grounds, Bruce v. Cole, [Ms. 1000080, Jan. 24, 2003] 564 So.2d 412 (Ala. 2003)]; Hanners v. Balfour Guthrie, Inc., 564 So.2d 412, 413 (Ala. 1990)."
Hobson v. American Cast Iron Pipe Co., 690 So.2d 341, 344 (Ala. 1997).
The record shows that on March 25, 1991, Deborah Bagley went to Creekside to look for a used car to purchase. She was accompanied by her daughters, Brittney and Necole, and Lockett. Deborah talked to a salesperson at Creekside about purchasing a used car. Deborah testified on deposition that she was initially interested in a Chevrolet Camaro automobile, but that the salesperson recommended to her a 1980 Mazda 626 automobile. The salesperson told her that the 1980 Mazda "was about the best one they had [on the dealership lot] at that time," and he encouraged her to test-drive it. During the test-drive Deborah heard a "wump, wump" kind of noise, "like a whining." When she returned the vehicle to the dealership, she described the noise to the salesperson. She said, "[i]t's kind of like [it has] a whining noise in it," to which, according to Deborah, the salesman replied, "[t]hat's how a Mazda [is] supposed to sound" and "that's the way they drive." According to the affidavit of Kenneth Parsons, the owner of Creekside, an "As Is-No Warranty" sticker with the words "As Is-No Warranty" in bold capital letters was posted on the window of the car, and the words "As Is" were written on the face of the Buyer's Guide, which Deborah signed on the reverse. In addition, Deborah signed an "As Is Bill of Sale," which specifically stated that the signer was disclaiming all express or implied warranties, including the warranties of merchantability and fitness for a *Page 305 
particular purpose. Parsons attested that the 1980 Mazda had over 95,000 miles on the odometer at the time of the sale.[2] Deborah purchased the 1980 Mazda that day without further inquiry as to its condition. After purchasing the car, Deborah, accompanied by her two daughters and Lockett, drove to Evelyn Boglin's house. Boglin thereafter drove the car to transport the Bagleys because she, unlike Deborah, had a driver's license. Later in the afternoon of the day she purchased the automobile, while Boglin was driving the group home after they had completed various errands, Deborah heard the noise again; shortly after she heard the noise one of the wheels separated from the car. Deborah testified that the noise stopped immediately before the wheel separated from the car. The car struck a guardrail, injuring the passengers.
The Bagleys retained Brown to determine, according to Brown, "how [the axle] had failed and was the part defective, was it defectively designed and are there other designs that are better."[3] Brown is employed by Metallurgical Services Company of Kentucky, Inc. ("MSC"); he owns 60% of the stock of MSC. MSC is involved in field inspections, failure analysis, customer service, and litigation support.[4] When asked on deposition if he had ever been involved in designing or changing an automotive-related part, Brown stated that he had given advice to a manufacturer on a brake-assembly design. Brown acknowledged that neither he nor MSC had ever provided input to a manufacturer concerning the basic design of an axle.
Brown testified that the axle-retention design on the 1980 Mazda was defective because, he said, it relied on a part known to wear out — the bearing — to hold the shaft of the axle in place and keep the axle from releasing, so that when the bearing failed, that failure necessarily allowed an ensuing release of the axle. Brown and an assistant used an exemplar model[5] of the axle they had purchased to explore its inner workings, resulting in Brown's conclusion that "[i]f the bearing fail[s], it releases the shaft." Brown stated that before he investigated the internal components of the exemplar axle, he already suspected that the design was defective because "by then I had the [Mazda workshop] manual and the manual says, you know, if the bearing comes off, the axle can come out." He also had a copy of the design drawings for the 1980 Mazda, which he testified depicted exactly what his exploration of the exemplar axle had confirmed. Brown explained that a "bearing-retaining collar" keeps the bearing in place and that the bearing keeps the axle shaft in the housing. When asked to explain the engineering sequence of events that led up to the accident, Brown answered: *Page 306 
 "Well, I can't say that I can establish it completely. But what appears to have happened is that the bearing — or at least some of the balls in the bearing [ — ] failed and that, at some point in time, caused the outer race[6] to crack at the same time and that released the — the axle except if the — if there is enough movement of the axle up or down to catch on one of the housings, it could create enough vibration to loosen the collar and work it off.
 "So that you have either the collar releasing the bearing just prior to failure or you have the bearing failing, which will, by itself, release the axle with a collar on it.
". . . .
 "What I can't testify to is the mechanism by which the collar came loose. I don't know whether it was defectively installed, didn't have the right interference, or interference fit, talking about, or whether it was just vibrated loose. If I had the axle, I could make that assessment, but I can't."
Brown stated that he inspected the inner and outer races, the individual ball bearings, and the collar of the 1980 Mazda, but that he did not examine the axle, shaft, or parts in the housing from the vehicle. Brown testified that in his opinion, as a result of the wear he observed on one of the ball bearings, there was "a significant number of revolutions" between the time the bearing began to fail and when it eventually failed, releasing the shaft. Brown never tested the failure rate of the retention system used by Mazda,[7] but testified that in his opinion, with the retention system designed by Mazda, the "probability is fairly low" for the axle shaft to separate from the housing "because if the collar doesn't slide and [the] bearing doesn't fail, the axle doesn't come out . . . ." When asked what would have made Mazda's design nondefective, he stated that it needed to have "been backed up with a C-clamp or a C-C-type back-up system."[8] According to Brown, an axle-retention system can become defective if it does not use a redundant system of both a bearing-retaining collar and a C-clip. Brown acknowledged that the Mazda pressure-fit retention system was an acceptable design and that he had used that same design principle when he designed an axle shaft for a press roller;[9] Brown's design for the press roller did not include a redundant C-clip because, according to him, "it held a gear on and you don't need a redundant design for that." Brown stated that the C-clip retention method was a feasible, alternative design in use in 1980 when Mazda manufactured the vehicle that is the subject of this action, and he stated in response to questioning as follows: *Page 307 
 "Q: You signed on to this letter that [the Bagleys' attorney] sent up to you on August 24 and I read, quote, `He will testify that there is a feasible alternative design employed in the industry,' closed quote.
"A: Right.
 "Q: `Whereby use of a C-clip or other means, even upon the event — even upon the failure of a bearing, the axle would not be allowed to exit the housing.'
"A: Correct.
"Q: Do you hold that opinion today?
"A: Yes.
". . . .
 "Q: Okay. Now, this alternative design that you say is feasible, in use in 1980 provided for what? For retention of the shaft through means of a C-clip?
"A: Right.
". . . .
 "Q: This alternative design, did it also have a collar or was the C-clip the mechanism of retention?
 "A: I don't recall. I don't remember, they — whether they had both or not."
When asked by Mazda's counsel, "if you have a design with a clip [as opposed to a pressure-fit system], axles can separate, and [the] same result as with the [1980] Mazda can occur; is that true?" Brown answered, "[s]ame thing with either one of them, neither one of them [are] what I have considered [a] redundant design." Brown explained that "the shaft can fail at the clips," but that he had never heard of a C-clip itself failing. In explaining how a shaft with a C-clip can fail, Brown stated:
 "If you design the axle to — to work with that groove in it,[10] [it] is a safe design. But if you have manufacturing defects that create cracks, which intensifies the stress at that point, then it becomes defective. It is not a design problem."
Brown acknowledged that the C-clip system is more susceptible to manufacturing defects than are the pressure-fitted bearing and retention-collar system. In fact, he acknowledged that he had previously testified in a case that an axle assembly manufactured by General Motors using a C-clip retention system was defective because of a manufacturing defect occasioned by grinding cracks resulting from the C-clip groove. Relative to that problem, which can infect a C-clamp system, Brown testified as follows:
 "Q: Are you aware of whether or not there are more axle separations with a C-clamp design than with a pressure fitted collar design?
"A: I can imagine there could be.
"Q: More with the C-clamp?
"A: Yes.
"Q: Why?
 "A: Defective manufacturing of the shaft, but that has nothing to do with the design.
 "Q: What makes the shaft susceptible to be defectively manufactured?
 "A: The fact that if the groove is improperly produced, you could form cracks in the surface which could lead to failure. It wasn't the design that failed. It was the shaft that failed due to manufacturing cracks that were put into the part."
Brown stated that he does not know and did not investigate whether it is possible for a C-clip to fail and allow the axle shaft to separate from the housing.
Brown opined that Mazda should have used a redundant system incorporating *Page 308 
both its present design and a C-clip, but he acknowledged that he did not know of any automobile manufacturer that employed both a pressure-fit collar and a C-clip retention system. In that regard, he stated:
 "Q: Are you aware of any [automobile] manufacturers that employ such a backup system?
"A: No
"Q: Have you ever seen any?
"A: I haven't investigated it.
 "Q: Have you ever seen any manufacturer, [automobile] manufacturer, that uses such a double retention system as a pressure fit and a C-clamp fit?
 "A: See, I haven't investigated it, so I don't know one way or another.
". . . .
 "Q: Are you aware of any axle where you have ever seen it designed into the retention system, both this pressure friction fit and a C-clamp type device?
 "A: I've never considered it, never investigated it, but is obvious it would be better than one or the other."
In explaining the superiority of his redundant design, Brown stated that "the C-clamp or C-clips do not come under load until the bearing fails . . . . But the axle won't come out because the C-clips retain it and, you know, the bearing fails." When asked what would happen under his alternative design when the bearing failed and the C-clip became loaded, Brown stated that if the C-clip was under a heavy load "over long periods of time" the C-clip could fail, and the axle would be released. Brown testified that how long the C-clip could withstand the load depends upon the design, and further stated that under his design "the C-clamp arrangement would be divided so that, as the shaft moves out, it would create a load [loud?] noise that would alert you to stop the car and not use it." Brown acknowledged that when a bearing fails, it also creates a sound, but he "does not know for sure what the noise [Deborah heard] was or, you know, whether [Deborah] knew where it was even coming from."
Brown was asked if, as he was suggesting, Mazda had employed a C-clip along with their pressure-fit system, would it have been possible for both devices to have failed; he said it was possible, but that "[t]hey don't fail simultaneously. They would have to fail sequentially. So, that's why you have an increased life and increased safety." Brown conceded that in reviewing the materials contained in his personal library, he had found no literature concerning axle bearings, retention methods, or any other material critical of Mazda's retention design, and that neither he nor his assistants had conducted any outside research in regard to the retention device used by Mazda. Brown acknowledged that if the collar from the 1980 Mazda either was too big or was improperly put on he could not find fault with the manufacturer, assuming the manufacturer had originally used the right part and had assembled the collar correctly. Brown also testified that although he was aware of the existence of Federal Motor Vehicle Safety ("FMVS") standards, he had never read any of the FMVS standards and he did not know if any of the FMVS standards applied to the issue involved in this case.
In their brief to this Court, the Bagleys assert:
 "Appellants' expert opines that a vehicle whose ability to stay supported by the tires and wheels that are attached to the axle [which] is wholly dependant upon the integrity of the bearing is unreasonably dangerous . . . .
". . . .
 "The defect claimed [by] the [Bagleys] is that the entire integrity of the system of *Page 309 
the suspension of the vehicle by which they suffered their injuries, is dependant upon a part that the manufacture[r] knows will fail, viz.: The Bearing."
Brown acknowledged in his deposition that in rendering his opinion as to the alleged defective design of the 1980 Mazda, he never conducted any research to determine whether there could be a failure of a C-clip, which is the basis of his alternative superior design, and he could not establish the exact cause for the collar's separation from Deborah's vehicle because he had never seen the axle on that vehicle. He further acknowledged (1) that the retention system used by Mazda, a pressure-fit system, is an acceptable retention-device mechanism, its only defect being its reliance on the bearing, a part susceptible to wear; (2) that his alternative design, the redundant C-clip, could also ultimately fail, allowing the shaft to separate from the housing; (3) that he did not know if a design exists that will last indefinitely; (4) that he could "imagine that there could be" more axle separations with the C-clip design than with the pressure-fit design because of defective manufacturing of the shaft when the groove is cut for the C-clip; (5) that he was not aware of any general engineering principles critical of the retention system used by Mazda, and he did not find or search for any literature critical of it; and (6) that it would be hard to criticize a manufacturer, from an engineer's perspective, if an after-market collar with larger dimensions than specified was installed using less force than that specified by the manufacturer.
Mazda's expert witness, James D. Varin, a registered professional engineer, testified by affidavit that he had worked in the automobile industry from 1969 until his retirement from Ford Motor Company in 1991. He testified that while employed at Ford he had served as a principal design engineer in the "Brake, Suspension, and Steering Design Department of Light Truck Engineering." Varin attested that he is familiar with the engineering principles associated with the design of component parts of an automobile axle, axle shaft, and wheel bearings, as well as methods of retention. He stated that he had firsthand knowledge that designs virtually identical to that used in the 1980 Mazda were widely used in the automotive industry when the axle and axle shaft used in the 1980 Mazda were manufactured by Mazda. Varin stated that, in preparing his affidavit, he had read Brown's deposition; had reviewed the Mazda drawings of the differential case assembly, rear axle, and shaft/brake assembly applicable to the 1980 Mazda; had read applicable portions of the workshop manual for the 1980 Mazda; and had inspected the remaining parts of the axle assembly of the subject vehicle. He further attested:
 "It is my opinion that the design of the axle, axle shaft assembly and the method of axle retention utilized by Mazda [were] proper and [were] a generally accepted design within the automotive industry. The Mazda design of the inner bearing race which encircles the axle shaft calls for an inside diameter that is slightly smaller than the outside diameter of the axle shaft. The bearing is then `press fit' onto the axle shaft. A bearing retainer, or collar, is also `press fit' onto the axle shaft. The inside diameters of the bearing and the collar and the outside diameter of the axle shaft are such that a minimum force of 2.7 tons (5,940 pounds) must be applied in order to accomplish the press fit. If the force required to press the bearing and collar on the axle shaft is less than the required 2.7 tons, the bearing and collar are not properly secured on the axle shaft. This procedure and the requirement that the installation force must *Page 310 
meet or exceed 2.7 tons to assure a secure installation are adequately and properly described in the [Mazda] Workshop Manual. . . .
 "[I]t is my opinion that the axle shaft was caused to partially separate from the vehicle due to the fact that the bearing and collar were not properly secured to the axle shaft . . . . The bearing itself was not the precipitating factor in this failure . . . . [T]he axle shaft did not slip completely free of the housing during the accident; . . . the axle shaft remained attached to the vehicle.
 "[I]t is my opinion that the improper installation of the wheel bearing and retainer or collar occurred during a repair performed after the vehicle left the control of Mazda . . . . The fact that this vehicle was manufactured at least seven years prior to the date of manufacture of the wheel bearing is proof that the bearing was installed as part of an after-market repair.[11] Also, there are punch marks on the inboard surface of the collar indicating that a hand punch was used to deform the collar locally, presumably to provide additional resistance to the axle shaft slipping free of the bearing. These punch marks are not part of a factory manufactured assembly. . . . The most probable cause of the present accident was that the original wheel bearing wore out and was not replaced before it spun on the axle shaft and scored and wore the journal area of the shaft. When the replacement bearing was installed on the shaft, the shaft was worn down so that the proper press fit was not achievable. . . . It is certain . . . that if the force required to install the bearing at the time of repair had met the requirement of 2.7 tons, it would not be possible for forces to be imposed on the bearing during subsequent vehicle operation to dislodge the axle shaft from the bearing and collar."
 Brown's Disqualification as an Expert Witness (Issue I)
Although the Bagleys argue that the trial court erred in disqualifying Brown under Daubert v. Merrill Dow Pharmaceutical, Inc.,509 U.S. 579 (1993), the trial court never referred to Daubert in its order; it simply stated that it found "that the expert testimony of David Brown should be excluded." The Bagleys assert that the appellate courts of this state "have never recognized that Daubert is controlling in any case . . . other than those involving the admission of DNA evidence." This is an accurate statement of the status of theDaubert standard in our state courts as of the time of this appeal. "[T]his Court has not abandoned the `general acceptance' test stated inFrye v. United States, 293 F. 1013, 1014 (D.C. Cir. 1923), and it has not adopted the Daubert standard in civil cases." Courtaulds Fibers, Inc. v.Long, 779 So.2d 198, 202 (Ala. 2000). The Daubert standard applies by statute in Alabama only to the admissibility of DNA evidence. Ala. Code 1975, § 36-18-30; see Turner v. State, 746 So.2d 355 (Ala. 1998).
The Bagleys do not advocate the adoption of Daubert — just the contrary. They argue that neither Daubert nor Frye v. United States,293 F. 1013 (D.C. Cir. *Page 311 
1923), could apply in this case, given what they characterize as the non-"rocket science" nature of Brown's investigations and conclusions. The Bagleys state that as they had "stated in the case, throughout, their expert employed no novel scientific methodology that would invoke the application of Daubert . . . or Frye" (emphasis added). Only Mazda urges in its brief the adoption of Daubert, but both it and Creekside emphatically argue that there is no showing that the trial judge relied on Daubert in excluding Brown's testimony. "`Our review is limited to the issues that were before the trial court — an issue raised on appeal must have first been presented to and ruled on by the trial court.'Norman v. Bozeman, 605 So.2d 1210, 1214 (Ala. 1992) (citation omitted)."Robinson v. Benton, [Ms. 1010167, May 24, 2002] 842 So.2d 631, 638 (Ala. 2002). Further, "[a]n appeals court will consider only those issues properly delineated as such, and no matter will be considered on appeal unless presented and argued in brief. Ex parte Riley, 464 So.2d 92 (Ala. 1985)." Braxton v. Stewart, 539 So.2d 284, 286 (Ala.Civ.App. 1988). Therefore, in addressing this issue, we need not reassess the continued applicability of Frye versus Daubert. The Bagleys argue to us, and confirm that they argued to the trial court, that neither apply to Brown's testimony; they argue to us that the error committed by the trial court was its presumed reliance on Daubert. Therefore, our analysis of the admissibility of Brown's testimony is governed by Rule 702, Ala. R. Evid., and the even broader considerations governing the admission of expert testimony found in Rule 104 and Rule 403, Ala.R.Evid.(None of the parties take the position that Brown's testimony could or should be evaluated under Rule 701, Ala. R. Evid., dealing with opinions expressed by a witness "not testifying as an expert.")
All expert testimony must satisfy the requirements of Rule 702, Ala. R. Evid., which provides:
 "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."
(Emphasis added.) Rule 104, Ala. R. Evid., states, in pertinent part:
 "(a) Questions of Admissibility Generally. Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of section (b). In making its determination it is not bound by the rules of evidence except those with respect to privileges."
The Advisory Committee's Notes to Rule 104(a) state:
 "Like preexisting Alabama law, and like the corresponding federal rule, this section recognizes that preliminary questions intended to establish conditions precedent to admissibility are for the court rather than the jury. C. Gamble, McElroy's Alabama Evidence § 464.01 (4th ed. 1991); Fed.R.Evid. 104. . . . This principle is . . . applied when a trial court determines whether a witness's qualifications authorize the witness to testify as an expert. See Ala.R.Evid. 702."
Rule 403, Ala. R. Evid., provides: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Page 312 
In order to decide if the trial court clearly exceeded its discretion in excluding Brown's testimony, we must determine whether Brown's testimony would assist the jury in deciding whether the Mazda axle-retention design is defective and, if so, whether the probative value of his testimony could be said to be substantially outweighed by the dangers or considerations in Rule 403.
 "In order to prove that a product is defective for purposes of the AEMLD, a plaintiff must prove that
 "'"a safer, practical, alternative design was available to the manufacturer at the time it manufactured the [automobile]. The existence of a safer, practical, alternative design must be proved by showing that:
 "'"(a) The plaintiff's injuries would have been eliminated or in some way reduced by use of the alternative design; and that
 "'"(b) taking into consideration such factors as the intended use of the [automobile], its styling, cost, and desirability, its safety aspects, the foreseeability of the particular accident, the likelihood of injury, and the probable seriousness of the injury if that accident occurred, the obviousness of the defect, and the manufacturer's ability to eliminate the defect, the utility of the alternative design outweighed the utility of the design actually used."'"
Hannah v. Gregg, Bland Berry, Inc., [Ms. 1002094, April 26, 2002]840 So.2d 839, 857-58 (Ala. 2002) (quoting Beech v. Outboard Marine Corp.,584 So.2d 447, 450 (Ala. 1991), quoting in turn General Motors Corp. v.Edwards, 482 So.2d 1176, 1191 (Ala. 1985), overruled on other grounds,Schwartz v. Volvo North America Corp., 554 So.2d 927 (Ala. 1989)) (emphasis omitted).
As noted, Brown testified that the retention system used by Mazda was an acceptable system, and that it was defective only because it relied upon a part known to wear — the bearing. He stated that he could not establish the engineering sequence of events that resulted in the accident and that he could not establish what mechanism caused the remnants of the bearing to put a load on the collar or how the collar came off. Brown stated that the alternative design he recommended could also fail, resulting in the axle's eventually separating from the vehicle. He admitted that he knew of no automobile manufacturer incorporating both a retention collar and a C-clip. With reference to his statement that a C-clip retention system was a feasible alternative design used in the automobile industry in 1980, he conceded that he could not recall if the system he had in mind also employed a retention collar. The feasibility of incorporating both a retention collar and a C-clip in the same axle shaft is not otherwise addressed in the record. Brown acknowledged that a system using only a C-clip could allow the axle shaft to separate from the vehicle and that because of the necessity for grinding a groove into the axle shaft to accommodate a C-clip, manufacturing defects in the axle shaft could occur. He opined that a system using only a C-clip could result in more axle separations than the pressure-fitted collar design. He acknowledged that Mazda's retention system was an acceptable design but for the "fairly low" probability of retention collar sliding. He conceded that he could not testify as to the "mechanism by which the collar [in the 1980 Mazda] came loose," but that among the possibilities, which he enumerated without ranking as to relative probability, was that the collar "was defectively installed" or that it "didn't have the right . . . interference fit." He explained that he could not be more specific because *Page 313 
he did not have the axle from the 1980 Mazda. Varin, who did have the axle, was able to establish that the wheel bearing was installed at least seven years after the subject vehicle was manufactured by Mazda, and that the collar bore punch marks, indicating the use of a hand punch, which was not part of Mazda's manufacturing process. He stated: "It is certain . . . that if the force required to install the bearing at the time of repair had met the requirement of 2.7 tons, it would not be possible for forces to be imposed on the bearing during subsequent vehicle operation to dislodge the axle shaft from the bearing and collar."
The Advisory Committee's Notes to Rule 702 explain that "[a]s under preexisting Alabama law, both questions — whether a witness is qualified as an expert and whether, if so qualified, that witness may give expert opinion or testimony on the subject in question — are left largely to the discretion of the trial judge. Hagler v. Gilliland,292 Ala. 262, 292 So.2d 647 (1974)." Under Rule 702, the trial court could have found that Brown was qualified to testify as an expert witness based on his education and experience, but that his testimony would not "assist the trier of fact." Based upon Brown's testimony, the trial court could have properly found that his testimony did not establish that Mazda's retention design was defective at the time the 1980 Mazda was manufactured because of all the considerations recounted above, particularly the fact that Brown could not state that a safer, practical, alternative design using both a retention collar and a C-clip was available in 1980.
Even if Brown's testimony satisfied the requirements of Rule 702, the trial judge could have excluded his testimony under Rule 403. The trial court could have properly found that the probative value of Brown's testimony was "substantially outweighed by the danger of . . . misleading the jury" because of the considerations already discussed. "Although the trial court gave no reason for its judgment, this Court will assume that it made whatever findings would be necessary to support its judgment.Lakeview Townhomes v. Hunter, 567 So.2d 1287 (Ala. 1990)." Richard BrownAuction Real Estate, Inc. v. Brown, 583 So.2d 1313, 1316 (Ala. 1991). Therefore, for all of the reasons explained, we cannot conclude that the trial court exceeded its discretion in excluding Brown's testimony.
Relating to this issue, the Bagleys concede in their brief that "if the Court deems the [Bagleys'] expert to be disqualified, then no further inquiry is necessary as [to] the AEMLD claim since it cannot be supported without expert testimony on the issue of whether or not the design was unreasonably dangerous." We agree; because we conclude that the trial court did not exceed its discretion when it excluded Brown's testimony, we need not examine further whether the trial court erred in entering a summary judgment in favor of Creekside and Mazda on the Bagleys' AEMLD claim. This conclusion disposes of the Bagleys' issues II[12] and III. *Page 314 
 Breach-of-Warranty Claim Against Creekside (Issue IV)
The Bagleys also contend that the trial court erred in entering a summary judgment for Creekside on their "breach-of-warranty" claim. They argue that Alabama law does not allow "as is" clauses to limit liability for personal injury resulting from use of a consumer good. They do not differentiate between express warranties and implied warranties. We conclude that Creekside extended no express warranty to the Bagleys. According to Deborah's deposition, a salesman at Creekside told her that the 1980 Mazda "was a good car" and that it was "about the best one they had [on the dealership lot] at that time." Section 7-2-313(2), Ala. Code 1975, states, in pertinent part, "an affirmation merely of the value of the goods or a statement purporting to be merely the seller's opinion or commendation of the goods does not create a warranty." In Pell CityWood, Inc. v. Forke Brothers Auctioneers, Inc., 474 So.2d 694, 695 (Ala. 1985), the plaintiff purchased a vehicle "as is" at an auction, and subsequently sued the auctioneer and the seller on claims of recision, breach of warranty, and fraud. The plaintiff argued that representations made by the auctioneer created an express warranty. This Court disagreed, however, explaining:
 "The statements of the auctioneer that `the trucks are in good condition,' and `the trucks are ready to work tomorrow' are clearly an example of `puffing' on the part of the auctioneer in an attempt to get more money at sale. Even if they are not classified as `puffing,' at best these statements are simply the auctioneer's opinion or commendation of the trucks which, according to Code 1975, § 7-2-313(2), do not rise to the level of an express warranty."
Likewise, no express warranties were ever created under the facts of this case.
Unless specifically disclaimed, implied warranties are created upon the sale of goods. Section 7-2-314, Ala. Code 1975, provides, in pertinent part:
 "(1) Unless excluded or modified (Section 7-2-316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .
"(2) Goods to be merchantable must be at least such as:
". . . .
 "(c) Are fit for the ordinary purposes for which such goods are used . . . ."
Section 7-2-315, Ala. Code 1975, states:
 "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under Section 7-2-316 an implied warranty that the goods shall be fit for such purpose."
To determine whether any implied warranties attached to the sale of the used 1980 Mazda to Deborah, we must look to § 7-2-316(3)(a), Ala. Code 1975, which provides, in relevant part, that "all implied warranties are excluded by expressions like `as is,' . . . or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty." This section allows a seller to exclude or modify, through commonly understood expressions, the otherwise statutorily implied warranties on the goods sold. As previously noted, according to the affidavit of Parsons, an "As Is-No Warranty" sticker was posted on the window of the 1980 Mazda and the words "As Is" were written below the sticker on the face of the Buyer's Guide, which Deborah *Page 315 
signed on its reverse side. Deborah also signed an "As Is Bill of Sale," which specifically detailed all of the warranties being disclaimed, including warranties of merchantability and fitness for a particular purpose. Therefore, Creekside satisfied the statutory language of §7-2-316(3)(a) by notifying Deborah, in two different documents, that the car she was purchasing was being sold "as is."
However, the Bagleys cite Ala. Code 1975, § 7-2-316(5), in support of their breach-of-warranty argument. Section 7-2-316(5) states, in pertinent part, that "[n]othing in subsection (2)[13] or subsection (3)(a) or in Section 7-2-317[14] shall be construed so as to limit or exclude the seller's liability for damages for injury to the person in the case of consumer goods." "Consumer goods" are defined as "goods that are used or bought for use primarily for personal, family, or household purposes." Ala. Code 1975, § 7-9A-102(a)(23). Here the Bagleys are suing based on personal injuries they suffered as a result of the purchase of a car, which, under the facts of this case, is a consumer good. In order for the Bagleys to sustain a claim for breach of an implied warranty, they must show "`the existence of the implied warranty, a breach of that warranty, and damages proximately resulting from that breach.'" Barrington Corp. v. Patrick Lumber Co., 447 So.2d 785,787 (Ala.Civ.App. 1984) (quoting Storey v. Day Heating AirConditioning Co., 56 Ala. App. 81, 83, 319 So.2d 279, 280 (1975)).
The record indicates that on the day Deborah purchased the 1980 Mazda, a wheel came off while the car was being driven. This fact raises the issue whether the car was fit for its ordinary purpose and therefore merchantable. Also, Deborah testified that a salesperson at Creekside, knowing the particular purpose for which Deborah was purchasing the car — roadway transportation — recommended the 1980 Mazda to her and dissuaded her from her first choice, which raises a fact question as to whether an implied warranty of fitness for a particular purpose existed. Thus, the evidence is sufficient to raise a genuine issue of material fact as to the Bagleys' claim as to damages for breach ofimplied warranties of merchantability and fitness for a particular purpose. We conclude, therefore, that the trial court erred in granting Creekside's motion for a summary judgment on the Bagley's breach-of-warranty claim as to the personal-injury claims arising out of the breach of the implied warranties of merchantability and fitness for a particular purpose; to that extent the summary judgment is due to be reversed.
 Fraud Claim Against Creekside (Issue V)
The Bagleys' final argument is that the trial court erred in entering a summary judgment for Creekside regarding the fraud claim. Creekside argues that the Bagleys' appeal on this claim was untimely. We note that the trial court initially entered a summary judgment for Creekside on May 11, 1998, and specifically *Page 316 
stated that it was certifying that judgment as final pursuant to Rule 54(b), Ala.R.Civ.P. The court amended its summary-judgment order on May 21, 1998, to clarify that the May 11 judgment covered only the fraud claim. On July 14, 1998, the trial court entered an "Amended Order Nunc Pro Tunc," again entering a partial summary judgment for Creekside on the fraud claim, and again certifying the judgment as final. Rule 54(b) states, in pertinent part:
 "When more than one claim for relief is presented in an action, . . . the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment."
Rule 4, Ala.R.App.P., provides, in relevant part, that, "in all cases in which an appeal is permitted by law . . . the notice of appeal required by Rule 3 shall be filed with the clerk of the trial court within 42 days (6 weeks) of the date of the entry of the judgment or order appealed from . . . ."
In opposing Creekside's timeliness challenge, the Bagleys cite Brownv. Whitaker Contracting Corp., 681 So.2d 226 (Ala.Civ.App. 1996). InBrown, the trial court entered a summary judgment for the defendant and certified it as final pursuant to Rule 54(b), Ala.R.Civ.P. The Court of Civil Appeals held that genuine issues of material fact existed as to the plaintiff's claim. The Court of Civil Appeals went on to state:
 "The trial court, in its order, should list the factors which it considered in reaching its decision regarding whether to certify the judgment, pursuant to Rule 54(b), in order that the appellate court is better equipped to review the trial court's action. . . .
 ". . . Hereafter, if a trial court should fail to list the factors considered, then the case will be returned so that the trial court can list those factors."
681 So.2d at 229. In Schneider National Carriers, Inc. v. Tinney,776 So.2d 753, 755 (Ala. 2000), this Court expressly overruled Brown, pointing out:
 "We held in Sho-Me [Motor Lodges, Inc. v. Jehle-Slauson Construction Co., 466 So.2d 83 (Ala. 1985),] that if it is clear and obvious from the language used by the trial court in its order that the court intended to enter a final order pursuant to Rule 54(b), then we will treat the order as a final judgment . . . ."
In Schneider, we further stated that "[n]othing in Rule 54(b) requires findings to buttress the conclusion `that there is no just reason for delay.' All that is required is an `express determination.'" 776 So.2d at 755-56.
The Bagleys argue that relying on Brown they "took no action to appeal said Order as under the law at that time it could not be considered a final order since the Judgment merely stated that it was `a final Summary Judgment' and that there was no just reason for delay." However, Brown
provided that if the trial court failed to list the factors considered in certifying a judgment as final pursuant to Rule 54(b), the case would be remanded for the trial court to list the factors. The approach advocated in Brown was not reasonably subject to the construction that the court's order was not a final, appealable order because it lacked certain phraseology; in order for the case properly to be remanded, rather than the appeal's just being dismissed, the judgment would have to be one that would support an appeal. In Ex parte Pritchett, 812 So.2d 1157 (Ala. 2000), this Court discussed the effect of Brown and noted that after the decision in Brown, "the Court of Civil Appeals routinely remanded cases that did not meet the level of specificity required by Brown." 812 So.2d at 1158. *Page 317 
In the present case, the 42-day period prescribed by Rule 4, Ala.R.App.P., for filing an appeal began to run on July 14, 1998, at the latest, the day the trial court entered its order nunc pro tunc, which, for the second time, expressly certified the partial summary judgment in favor of Creekside as to the fraud claim as final pursuant to Rule 54(b). Even if Creekside had not pointed out the untimeliness of the appeal of that ruling, "[i]t is the duty of this Court to take notice of the filing date of an appeal and, if finding the appeal to be untimely, to dismiss it ex mero motu. Stewart v. Younger, 375 So.2d 428 (Ala. 1979)." Lewis v. State, 463 So.2d 154, 155 (Ala. 1985). The Bagleys' notice of appeal, filed on April 29, 2002, almost four years after the partial summary judgment was last certified as final, is untimely as to that partial summary judgment and the Bagleys' appeal from that partial judgment is dismissed.
In summary, the trial court's summary judgments for Creekside and Mazda on the AEMLD claim are affirmed. To the extent the Bagleys' appeal relates to the partial summary judgment for Creekside on the fraud claim, the appeal is dismissed. The trial court's summary judgment for Creekside on the breach-of-express-warranty claim is affirmed, but is reversed as to the breach-of-implied warranty claim(s). The case is remanded for the entry of orders and for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; APPEAL DISMISSED IN PART; AND CASE REMANDED.
MOORE, C.J., and HOUSTON, SEE, LYONS, BROWN, JOHNSTONE, WOODALL, and STUART, JJ., concur.
[1] Throughout the record and the briefs to this Court this name is spelled "Nichole"; however, Deborah Bagley, in her deposition, spelled her daughter's name "N-e-c-o-l-e."
[2] The "As Is Bill of Sale" stated that the odometer reading did not reflect the actual mileage, but it did not specify what the actual mileage was or why there was a discrepancy.
[3] In their initial discussions with Brown the Bagleys told him that the accident involved the failure of an axle.
[4] Brown stated that various companies employ MSC to come to their place of business to
 "do an inspection of whatever it is that they want inspected. It might be a deregulator. It might be a boiler. It might be a condenser . . . . They have got a unit that they want to rerate to a higher operating pressure and temperature so we will check the ratings."
[5] Although the Bagleys assert in their brief that the exemplar axle was the same make, model, and year as the axle involved in this case, Brown never testified as to those characteristics of the exemplar axle. Brown merely stated that an assistant "went and bought the exemplar rear axle."
[6] The record does not contain a description or definition of the term "race." Merriam-Webster's Collegiate Dictionary (10th ed. 2002), defines a race, in one context, as "a track or a channel in which something rolls or slides; specif: a groove (as for the balls) in a bearing."
[7] When the 1980 Mazda was manufactured, Mazda used a "pressure-fit" system, in which the bearing and the bearing-retaining collar were each pressed into place on the axle shaft under specifically calibrated intense pressure to firmly secure them.
[8] The terms "C-clamp" and "C-clip" are used interchangeably throughout Brown's deposition. According to Brown, a C-clip is not a wearing part like the bearing, and its use would prevent the axle from leaving the housing, even upon the failure of the bearing.
[9] Brown's design used a shrunk-fit system, not a pressure-fit system, but he stated that they both employed the same friction-fit principle.
[10] According to Brown, in order to install a C-clip, grooves must be cut into the shaft in which the C-clip is inserted.
[11] In making this determination, Varin used a manufacturing code imprinted on the wheel bearing to identify its manufacturer and the date of its manufacture. He was thereby able to identify the time of manufacture of the wheel bearing as having been between July and December 1987. This fact was undisputed before the trial court, never having been objected to or challenged in any way by the Bagleys. Brown, on the other hand, acknowledged that he did not know when the collar was manufactured, and he never made any attempt to determine its date of manufacture.
[12] In addition, the Bagleys fail to cite in their brief any authority in support of their arguments relating to issue II. We are provided no explanation of the nature of an AEMLD claim or its elements or how it was error for the trial court to enter summary judgments as to the AEMLD claim. "`When an appellant fails to cite any authority for an argument on a particular issue, this Court may affirm the judgment as to that issue, for it is neither this Court's duty nor its function to perform an appellant's legal research. Rule 28(a)(5) [now Rule 28(a)(10), Ala.R.App.P.]; Spradlin v. Birmingham Airport Authority, 613 So.2d 347
(Ala. 1993).'" Whited v. Holmes, 816 So.2d 20, 26 (Ala. 2001) (quotingCity of Birmingham v. Business Realty Inv. Co., 722 So.2d 747, 752 (Ala. 1998)).
[13] Ala. Code 1975, § 7-2-316(2), provides:
 "(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that "There are no warranties which extend beyond the description on the face hereof."
[14] Ala. Code 1975, § 7-2-317, provides the process for resolving any conflict that might arise between warranties.