954 So.2d 545 (2006)
William P. WARE, D.O., et al.
v.
Johnnie TIMMONS, as administratrix of the estate of Brandi Timmons, deceased.
1030488.
Supreme Court of Alabama.
May 5, 2006.
As Modified on Denial of Rehearing September 22, 2006.
*547 W. Stancil Starnes, Randal H. Sellers, and Walter W. Bates of Starnes & Atchison, LLP, Birmingham, for appellants William Ware, Lil Hayes, and Anesthesiology & Pain Medicine of Montgomery, P.C.
Joseph M. Brown, Jr., Gregory B. Breedlove, David G. Wirtes, Jr., and George M. Dent III of Cunningham, Bounds, Yance, Crowder & Brown, LLC, Mobile, for appellee.
SEE, Justice.[1]
William P. Ware, D.O., an anesthesiologist; Lil Hayes, a certified registered nurse anesthetist ("CRNA"); and Anesthesiology & Pain Medicine of Montgomery, *548 P.C., appeal the trial court's judgment entered on a jury verdict in favor of Johnnie Timmons, as the administratrix of the estate of her daughter, Brandi Timmons, deceased. We reverse and remand.

I.
On December 23, 1998, 17-year-old Brandi Timmons underwent elective surgery to correct an overbite. Approximately 15 minutes after that surgery was completed, CRNA Lil Hayes ("Nurse Hayes") decided to remove the breathing tube that was used to counteract the effects of anesthetization. An anesthesiologist was summoned over the hospital speaker system to monitor the removal of the tube, and Dr. Ware arrived to watch Nurse Hayes remove Brandi's breathing tube. Brandi was then disconnected from the equipment that monitored her vital signs and was moved to the postanesthesia care unit ("PACU").
Minutes after she was reconnected to monitoring equipment in the PACU, Brandi went into cardiac arrest. Tests later revealed that Brandi's brain had suffered irreversible damage caused by events that occurred during her recovery from anesthesia. Brandi later died as a result of the brain damage.
Johnnie Timmons, on behalf of her daughter's estate, sued Nurse Hayes; Dr. Ware; and Anesthesiology & Pain Medicine of Montgomery, P.C., Nurse Hayes and Dr. Ware's employer at the time of Brandi's surgery, alleging medical malpractice and wrongful death.[2] Timmons alleged that the treatment Nurse Hayes provided to Brandi during her postoperative recovery fell below the applicable standard of care. Invoking the doctrine of respondeat superior, Timmons alleged that both Dr. Ware, as Nurse Hayes's supervising anesthesiologist, and Anesthesiology & Pain Medicine of Montgomery, P.C., as Nurse Hayes's employer, were vicariously liable for Nurse Hayes's conduct.
At trial, the defense objected to Timmons's claim that Dr. Ware could be held vicariously liable for Nurse Hayes's conduct, arguing that Nurse Hayes was an employee of Anesthesiology & Pain Medicine of Montgomery, P.C., not of Dr. Ware individually. The trial court overruled the objection and gave the jury the following instruction:
"I charge you  as it relates to agency and vicarious liability, I charge you the issue of agency in this case is not in dispute. Both the physician [Dr. Ware] and the CRNA [Nurse Hayes] were at all times working within the line and scope of their employment with Anesthesiology & Pain Medicine of Montgomery, P.C.
"Therefore, I charge you if you should return a verdict in favor of the plaintiff and against either Dr. Ware or Nurse Hayes, that necessarily requires that you also return a verdict in favor of the plaintiff against Anesthesiology & Pain Medicine of Montgomery, P.C., as well.
"The Court charges you further that the responsibility of Dr. Ware for the acts and omissions of Nurse Hayes is likewise not in dispute. Therefore, should you return a verdict in favor of the plaintiff and against [Nurse] Hayes, you must necessarily also return a verdict against Dr. Ware as well."
*549 The jury returned a verdict against Nurse Hayes, Dr. Ware, and Anesthesiology & Pain Medicine of Montgomery, P.C. The trial court, entering a judgment on the jury's verdict, awarded Timmons $13.7 million in damages.[3] Dr. Ware, Nurse Hayes, and Anesthesiology & Pain Medicine of Montgomery, P.C., appeal.

II.
The trial court instructed the jury that based on the doctrine of respondeat superior Dr. Ware is liable as a matter of law for Nurse Hayes's tortious acts. Under that doctrine, a "master shall be civilly liable for the tortious acts of his servant." Philadelphia & Reading R.R. v. Derby, 55 U.S. (14 How.) 468, 486, 14 L.Ed. 502 (1852). The dispositive issue on this appeal is whether, as Dr. Ware argues, the trial court erred in instructing the jury as to his vicarious liability for the acts of Nurse Hayes.[4]
Dr. Ware asserts that Timmons conceded at trial that Dr. Ware and Nurse Hayes were co-employees; therefore, Dr. Ware argues, he could not be held vicariously liable for Nurse Hayes's conduct under the doctrine of respondeat superior. Timmons argues, however, that she introduced uncontroverted evidence showing that Dr. Ware, as the supervising anesthesiologist, had a reserved right of control over Nurse Hayes's acts and omissions, which, she argues, entitled the trial court to charge the jury that Dr. Ware was vicariously liable for Nurse Hayes's conduct. Thus, we must first resolve the dispute between the parties concerning the appropriate standard for determining the applicability of the doctrine of respondeat superior to the relationship between Dr. Ware and Nurse Hayes.
A trial court's "ruling on a question of law carries no presumption of correctness." Ex parte Graham, 702 So.2d 1215, 1221 (Ala.1997). Accordingly, this Court reviews de novo the trial court's conclusion as to the appropriate standard for determining whether a master-servant relationship exists. 702 So.2d at 1221.

III.
"To recover against a defendant under the theory of respondeat superior, it is necessary for the plaintiff to establish the status of employer and employee  master and servant." Hendley v. Springhill Mem'l Hosp., 575 So.2d 547, 550 (Ala. 1990). We have previously stated that "[p]roof of a master and servant relationship is tested by the degree of control the alleged master retains over the alleged servant." Gossett v. Twin County Cable T.V., Inc., 594 So.2d 635, 639 (Ala.1992). Thus, Timmons argues that Dr. Ware, as the supervising anesthesiologist, had a reserved right of control over Nurse Hayes's acts and omissions and is consequently liable under the doctrine of respondeat superior. The right-of-control test is pertinent to whether there is a master-servant relationship, but it is dispositive only when the question is the limited one of whether an alleged servant is in fact a servant or, instead, an independent contractor:
"The test for determining whether a person is an agent or employee of another, *550 rather than an independent contractor with that other person, is whether that other person has reserved the right of control over the means and method by which the person's work will be performed. . . . "
Martin v. Goodies Distrib., 695 So.2d 1175, 1177 (Ala.1997); see also Moore-Handley Hardware Co. v. Williams, 238 Ala. 189, 195, 189 So. 757, 762 (1939) (stating that the right-of-control test is used "`to determine whether in doubtful cases the relation between a workman and those for whom he was rendering service was that of an employee or of an independent contractor'" (quoting Birmingham Post Co. v. Sturgeon, 227 Ala. 162, 167, 149 So. 74, 78 (1933))).
The right-of-control test does not resolve the question whether a servant who is in fact a servant, and not an independent contractor, is the servant of one master or of another. In Ex parte Stewart, 518 So.2d 118 (Ala.1987), this Court addressed whether a rental agent could be classified as the employer of the resident manager of an apartment complex for the purpose of the manager's recovering workers' compensation benefits.[5] We noted:
"Had the instant case presented the question of whether Stewart was an `employee' as opposed to an `independent contractor,' the [right-of-control] test of American Tennis Courts[, Inc. v. Hinton, 378 So.2d 235 (Ala.Civ.App.1979),] would have resolved the issue. However, no one contends in this case that Stewart was an `independent contractor.' Indeed, it appears to be uncontested that Stewart was someone's `employee' within the meaning of the worker's compensation law. The question is: whom did she serve as an employee, Carter Realty or the owners of the apartments? As a legal and logical matter, the `control' test of American Tennis Courts often cannot provide a meaningful answer to such a question."
518 So.2d at 119-20.
Dr. Ware does not assert that Nurse Hayes was an independent contractor, nor does he otherwise challenge Nurse Hayes's classification as a servant under the doctrine of respondeat superior. Instead, Dr. Ware questions the trial court's jury instruction that he was Nurse Hayes's master. He argues that he cannot be vicariously liable for the acts or omissions of Nurse Hayes because she was an employee of Anesthesiology & Pain Medicine of Montgomery, P.C., not of Dr. Ware individually. Dr. Ware's framing of the issue is supported by the first part of the trial court's instruction to the jury:
"I charge you  as it relates to agency and vicarious liability, I charge you the issue of agency in this case is not in dispute. Both the physician [Dr. Ware] and the CRNA [Nurse Hayes] were at all times working within the line and scope of their employment with Anesthesiology & Pain Medicine of Montgomery, P.C."[6] *551 Timmons proposed that the trial court use this language in instructing the jury, and Dr. Ware has conceded that this part of the trial court's instruction is correct. Thus, Dr. Ware and Timmons agreed that Anesthesiology & Pain Medicine of Montgomery, P.C., was, as a matter of law, acting as the master of both Nurse Hayes and Dr. Ware.[7] By doing so, Timmons and Dr. Ware stipulated that Anesthesiology & Pain Medicine of Montgomery, P.C., possessed the right to control not only Nurse Hayes's actions at the time of Brandi's operation, but also Dr. Ware's actions. In light of these concessions, the propriety of the trial court's instruction concerning Dr. Ware's liability hinges upon whether Dr. Ware  as an individual whose right to control *552 a servant stems from his own status as a servant to the same employer  satisfies the common-law definition of a master.
The right-of-control test, by itself, "cannot provide a meaningful answer" to the question whether Dr. Ware was Nurse Hayes's master. Stewart, 518 So.2d at 120. In Hendrix v. Frisco Builders, Inc., 282 Ala. 473, 476, 213 So.2d 208, 210 (1968), and earlier in Alabama Power Co. v. Key, 224 Ala. 286, 287, 140 So. 233, 233 (1932), we stated: "He is master who has the supreme choice, control and direction of the servant and whose will the servant represents in the ultimate result and in all its details." Thus, "`[t]he general rule is that to constitute the relationship between master and servant for the purpose of fixing liability on the former for the acts of the latter under the doctrine of respondeat superior, it is indispensable that the right to select the person claimed to be a servant should exist.'" Davenport-Harris Funeral Home, Inc. v. Chandler, 38 Ala. App. 463, 466, 88 So.2d 875, 877 (1956) (quoting Motor Terminal & Transp. Co. v. Simmons, 28 Ala.App. 190, 193, 180 So. 597, 599 (1938)).[8]
Because a master-servant relationship must be consensual, to qualify as a master, one must have the power to select the alleged servant. Accord State Farm Mut. Auto. Ins. Co. v. Vails, 278 Ala. 266, 270, 177 So.2d 821, 824 (1965) (affirming the trial court's conclusion that a master-servant relationship did not exist in the absence of consent). This requirement of consent derives not from the direct test for imposing vicarious liability, but from the elements necessary to form the agency relationship upon which the application of the doctrine of respondeat superior is founded. "As a reminder to the bench and bar of the analytical underpinnings involved in this analysis, we note that a master-servant relationship is a subgroup of principal-agent relationships; a master is a subspecies of principal and a servant is a subspecies of agent." Terry v. Phillips 66 Co., 591 So.2d 33, 36 n. 1 (Ala.1991). Thus, "[t]he rules applicable generally to principal and agent as to the creation of the relation, delegability and capacity of the parties apply to master and servant." Restatement (Second) of Agency § 25 (1958).
The Restatement (Second) of Agency explains the formation of the relationship between principal and agent as follows:
"The relation of agency is created as a result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act *553 on the principal's behalf and subject to his control."
Restatement (Second) of Agency § 1 cmt. a (1958).[9] Because "[a] master is a species of a principal,"[10] an alleged employer not only must possess a right of control, but also must have voluntarily entered into the relationship, that is, had the right to choose  to select and to dismiss  the alleged servant; otherwise, there is no master-servant relationship. Therefore, absent evidence that the alleged master had the power to select and dismiss the servant, there is no proof that a consensual relationship was ever formed. Accordingly, the trial court's instruction that Dr. Ware is liable as a matter of law for the acts and omissions of Nurse Hayes was correct only if Timmons had introduced evidence of both elements of respondeat superior liability on the part of Dr. Ware, namely, that Dr. Ware and Nurse Hayes had voluntarily entered into their relationship and that Dr. Ware possessed a reserved right of control.[11]

IV.
Vicarious liability stemming from a master-servant relationship  respondeat superior liability  is usually a *554 question of fact for the jury. See Hendrix, supra. However, in Batson v. Birmingham Trust & Savings Co., 241 Ala. 629, 632, 4 So.2d 307, 310 (1941), this Court noted:
"`Whenever the evidence upon a given subject is without dispute and only one rational conclusion can be drawn from such evidence, then the trial judge, at the written request of either of the parties to the cause, may charge the jury as to the effect of such evidence, and he will not be put in error for so doing.'"
(Quoting Riley v. Fletcher, 185 Ala. 570, 578, 64 So. 85, 88 (1913).)
Thus, the trial court's instruction on Dr. Ware's liability, submitted to the trial court by Timmons, is not error if the facts in the record demonstrate that the only rational conclusion to be drawn from the evidence is that Dr. Ware both had the reserved right to control Nurse Hayes's actions and also had entered into a consensual relationship with Nurse Hayes for the performance of Brandi's surgery.
A. Evidence of a Reserved Right of Control
At trial, Dr. Ware conceded that, as supervising anesthesiologist during Brandi's surgery, he had the right to control Nurse Hayes's actions. Nurse Hayes also testified that as a nurse anesthetist she operates under "the supervision and direction of the anesthesiologist." In addition, Timmons introduced evidence showing that the procedure manual at Baptist Medical Center East (the hospital at which Brandi's operation took place) requires "all anesthesia care . . . be directed by a qualified physician anesthesiologist." Finally, § 34-21-81(4)(c), Ala.Code 1975, requires a CRNA such as Nurse Hayes to "function[] under the direction of a physician licensed to practice medicine, . . . who is immediately available." Thus, Timmons's claim that Nurse Hayes was under the supervision and control of Dr. Ware is the only rational conclusion to be drawn from the evidence presented at trial.[12]
B. Evidence of a Right of Selection
Although the evidence introduced at trial amply supports the premise that Dr. Ware had the right of control over Nurse Hayes's actions, it does not support the premise that Dr. Ware, in his individual capacity, chose Nurse Hayes for Brandi's surgery. To the contrary, the evidence indicates that the right of selection of a CRNA to assist Dr. Ware resided in Anesthesiology & Pain Medicine of Montgomery, P.C.
When describing his work relationship with the CRNAs employed by Anesthesiology & Pain Medicine of Montgomery, P.C., Dr. Ware testified that he and a CRNA "would both be assigned to a case." Timmons did not introduce any evidence rebutting Dr. Ware's statement. Both Dr. Ware and Nurse Hayes also testified that their involvement in Brandi's operation was in the course and scope of their employment with Anesthesiology & Pain Medicine of Montgomery, P.C. Further, the jury instruction Timmons proposed, which she argued was based on uncontroverted evidence, stated that "[b]oth [Dr. Ware] and [Nurse Hayes] were at all times *555 working within the line and scope of their employment with Anesthesiology & Pain Medicine of Montgomery, P.C." These pieces of evidence permit  if they do not compel  the rational conclusion that Dr. Ware's right of control over Nurse Hayes's conduct arose from his supervisory position as her co-employee at Anesthesiology & Pain Medicine of Montgomery, P.C.
The Restatement (Second) of Agency expressly rejects the idea that co-employees are vicariously liable for one another's torts:
"The agent of a disclosed or partially disclosed principal is not subject to liability for the conduct of other agents unless he is at fault in appointing, supervising, or cooperating with them."
§ 358(1). The commentary to § 358(1) illustrates this rule in the context of a supervisor-subordinate relationship, stating that "[t]he doctrine of respondeat superior does not apply to create liability against an agent for the conduct of servants and other agents of the principal appointed by him, even though other agents are subject to his orders in the execution of the principal's affairs."
The requirement of consent negates the finding of a respondeat superior relationship as between co-employees. As Meyer v. Holley, 537 U.S. 280, 123 S.Ct. 824, 154 L.Ed.2d 753 (2003), explains:
"The Restatement § 1 specifies that the relevant principal/agency relationship demands not only control (or the right to direct or control) but also the `manifestation of consent by one person to another that the other shall act on his behalf . . ., and consent by the other so to act.' (Emphasis added [in Meyer].)"
537 U.S. at 286, 123 S.Ct. 824. In the co-employee context, each employee manifests a consent to enter into a relationship with the employer. However, it is the employer that establishes each employee's relationship with the other employees. Thus, because co-employees do not individually agree to act on one another's behalf, their relationship to one another is not consensual. Therefore, as a matter of law, the doctrine of respondeat superior does not hold supervisors, as co-employees, vicariously liable for the torts of their subordinates. Supervisors lack the ability to willingly choose to enter into a relationship with their subordinates; likewise subordinates do not have the ability to choose to enter into a relationship with their supervisors.
"He who relies upon the doctrine of respondeat superior to fasten liability for tort has the burden of proving the relation of master and servant. . . ." Alabama Power Co. v. Key, 224 Ala. at 287, 140 So. at 233. At a minimum, Timmons's failure to introduce evidence bearing on whether Dr. Ware, in his individual capacity as the supervising anesthesiologist, had a right of selection prevents the conclusion that Dr. Ware, in that capacity, chose Nurse Hayes to assist in Brandi's operation. Thus, Timmons failed to meet her burden of proving that Dr. Ware, in his individual capacity, satisfies the common-law definition of a master.
The trial court said when it overruled Dr. Ware's objection to the instruction on Dr. Ware's vicarious liability for Nurse Hayes's actions:
"Well, [Dr. Ware] took over [Brandi's] care . . . I understand. So whichever one was in that place, was [Nurse Hayes's] supervisor."
The trial court's decision to charge the jury that Dr. Ware was vicariously liable for Nurse Hayes's conduct apparently was based on the belief that a reserved right of control was the only factor Timmons needed to prove to establish that Dr. Ware was Nurse Hayes's master. Timmons reinforces *556 that conclusion when she argues in support of the trial court's instruction that "Dr. Ware, as the supervising or directing anesthesiologist, necessarily must be liable in respondeat superior for the [CRNA] he is directing." However, if Dr. Ware merely controlled Nurse Hayes's acts in his capacity as a co-employee of Nurse Hayes, and as her supervisor, he is not by virtue of that relationship vicariously liable under the doctrine of respondeat superior.

V.
Although we have concluded that Dr. Ware is not vicariously liable for Nurse Hayes's conduct based on his supervisory status alone, that determination does not end our inquiry. We may affirm the trial court's judgment if it is correct for any reason. See Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 960 (Ala.2004) ("This Court cannot avoid its obligation to affirm the trial court's judgment if that court has reached the correct result. . . ."). Timmons argues that two additional facts support the trial court's decision to instruct the jury on vicarious liability as to Dr. Ware: (1) Dr. Ware's status as a professional practicing in a professional corporation, and (2) Dr. Ware's status as a primary shareholder in Anesthesiology & Pain Medicine of Montgomery, P.C.
A. Dr. Ware's Status as a Professional Practicing in a Professional Corporation
Section 10-4-390(a), Ala.Code 1975, provides:
"Every individual who renders professional services as an employee of a domestic or professional corporation shall be liable for any negligent or wrongful act or omission in which he personally participates to the same extent as if he rendered such services as a sole practitioner."
At trial, Dr. Ware described himself as practicing medicine at Anesthesiology & Pain Medicine of Montgomery, P.C., a professional corporation. Timmons argues that because Dr. Ware participated in Brandi's surgery, he is vicariously liable under § 10-4-390, Ala.Code 1975, for Nurse Hayes's conduct to the same extent that he would have been had he supervised Nurse Hayes as a sole practitioner. Thus, Timmons argues, the statute  in abrogation of the common-law doctrine of respondeat superior  imposes on supervisors who are professionals practicing in a professional corporation vicarious liability for the conduct of their subordinates.
In Weaver v. Hollis, 247 Ala. 57, 60, 22 So.2d 525, 528 (1945), this Court stated:
"The common law is the base upon which all of the laws of this State have been constructed, and when our courts are called upon to construe a statute,  when they are called upon to ascertain and declare the legal effect and meaning of a legislative enactment,  they must read the statute in the light of the common law."
Accordingly, we presume "that the legislature does not intend to make any alteration in the law beyond what it explicitly declares." Duncan v. Rudulph, 245 Ala. 175, 176, 16 So.2d 313, 314 (1944). Thus, for § 10-4-390(a), Ala.Code 1975, to impose vicarious liability on Dr. Ware as Nurse Hayes's supervisor, based on his status as a professional practicing in a professional corporation, the statute must convey its intention to do so "either in express terms or by unmistakable implication." 245 Ala. at 176, 16 So.2d at 314.
By its text, § 10-4-390(a), Ala.Code 1975, imposes on Dr. Ware direct liability only for his own negligence, wrongful acts, or omissions. It states that the professional *557 "shall be liable for any negligent or wrongful act or omission in which he personally participates." The commentary explains the statute as follows:
"Subsection (a) states explicitly that individual professionals remain liable for their own negligent or wrongful acts or omissions. Thus, the liability of a professional to his client or patient for his negligent or wrongful acts or omissions will be the same whether the professional is acting as an employee of a professional corporation or as a sole practitioner."
Under § 10-4-390(a), Ala.Code 1975, Dr. Ware's status as a physician practicing in a professional corporation does not supply a basis for affirming the trial court's judgment on the basis that it did not err in instructing the jury that Dr. Ware is vicariously liable for Nurse Hayes's conduct.
B. Dr. Ware's Status as a Primary Shareholder in a Professional Corporation
Dr. Ware described himself as a partner in Anesthesiology & Pain Medicine of Montgomery, P.C. Timmons argues that Dr. Ware's status as a shareholder in a professional corporation subjects him to vicarious liability for Nurse Hayes's conduct. However, § 10-4-390(b), Ala.Code 1975, states:
"The personal liability of a shareholder, employee, director or officer of a domestic professional corporation . . . shall be no greater in any respect than that of a shareholder, employee, director or officer of a corporation organized under the Alabama Business Corporation Act."
This Court recognizes that the common-law doctrine of respondeat superior governs the vicarious liability of corporations organized under the Alabama Business Corporation Act. See National States Ins. Co. v. Jones, 393 So.2d 1361, 1367 (Ala.1980) ("`The liability of a corporation for the torts of its employees, whether agent or servant, is grounded upon the principle of "respondeat superior." . . .'" (quoting Old Southern Life Ins. Co. v. McConnell, 52 Ala.App. 589, 594, 269 So.2d 183, 186 (1974))). Thus, § 10-4-390(b) does not impose vicarious liability where the doctrine of respondeat superior would not do so. Accordingly, Dr. Ware's testimony regarding his status as a shareholder of Anesthesiology & Pain Medicine of Montgomery, P.C., does not permit the conclusion that he is vicariously liable for Nurse Hayes's acts and omissions. The jury instruction therefore cannot be held to be proper on this basis.

VI.
Timmons argues that this Court should not address the issue of the trial court's instruction on Dr. Ware's vicarious liability because, she says, Dr. Ware did not dispute vicarious liability at trial. We find Timmons's argument to be without merit.
"This Court cannot consider arguments raised for the first time on appeal; rather, our review is restricted to the evidence and arguments considered by the trial court." Andrews v. Merritt Oil Co., 612 So.2d 409, 410 (Ala.1992). Accordingly, to preserve the issue of the propriety of the jury instruction for appellate review, the alleged error in the instruction must have been brought to the trial court's attention and ruled upon. See Lawson v. Garrett, 286 Ala. 125, 129, 237 So.2d 648, 652 (1970) ("We cannot put a trial judge in error for failure to rule on a matter which has never been presented to, nor decided by, him.").
Rule 51, Ala. R. Civ. P., provides:
"No party may assign as error the giving or failing to give a written instruction, *558 or the giving of an erroneous, misleading, incomplete, or otherwise improper oral charge unless that party objects thereto before the jury retires to consider its verdict, stating the matter objected to and the grounds of the objection."
Thus, to preserve his argument as to the jury instruction, Dr. Ware must have: (1) objected before the jury retired to consider its verdict; (2) stated the matter that he was objecting to; and (3) supplied the grounds for his objection.
Dr. Ware's objection to the jury charge concerning his vicarious liability must have been timely. When an appellant "fail[s] to make a timely objection, there is nothing for this Court to review." Hancock v. City of Montgomery, 428 So.2d 29, 32 (Ala.1983). "To be timely, an objection to the trial court's oral charge, with grounds for the objection, must be made before the jury retires to consider its verdict." American Cast Iron Pipe Co. v. Williams, 591 So.2d 854, 856 (Ala.1991). Dr. Ware's objection to the jury instruction was made at the charge conference held on June 19, 2003; the jury began its deliberations on June 20, 2003. Thus, Dr. Ware's objection was timely.
Rule 51, Ala. R. Civ. P., requires that, in addition to making a timely objection, Dr. Ware "stat[ed] the matter objected to." We have previously noted that a statement of the matter objected to must be specific. See, e.g., Burnett v. Martin, 405 So.2d 23, 28 (Ala.1981) ("[T]he objection must be made specifically."). Timmons proposed the instruction on Dr. Ware's vicarious liability. In response to that proposed instruction, the following exchange took place between the trial court and Dr. Ware's counsel:
"The Court: Do y'all object to this charge?
"[Dr. Ware's counsel]: Yes, sir, Judge. . . .
"Certainly, there's no question but that the [professional corporation] is responsible for the acts or omissions of Dr. Ware and Lil Hayes. However. . . .
"The next paragraph, Your Honor, is certainly to be stricken where they request that you charge the jury, `The Court charges you further that the responsibility of Dr. Ware for the acts and omissions of Nurse Hayes is likewise not in dispute.'"
The language quoted by Dr. Ware's counsel comes from the following portion of the trial court's charge:
"The Court charges you further that the responsibility of Dr. Ware for the acts and omissions of Nurse Hayes is likewise not in dispute. Therefore, should you return a verdict in favor of the plaintiff and against [Nurse] Hayes, you must necessarily also return a verdict against Dr. Ware as well."
Thus, Dr. Ware's counsel was specific in stating the matter to which he objected: he quoted the portion of the jury charge that pertained to Dr. Ware's vicarious liability for Nurse Hayes's acts and omissions. Therefore, the statements of Dr. Ware's counsel at trial satisfied the second element of Rule 51, Ala. R. Civ. P.
In addition to timeliness and specificity in stating the matter objected to, Rule 51 requires that an objection be accompanied by a statement of its grounds. "[T]he complaining party must have stated adequately specific grounds as a basis for the objection." Nelms v. Allied Mills Co., 387 So.2d 152, 154 (Ala.1980).
Counsel for Dr. Ware argued that Dr. Ware's responsibility for Nurse Hayes's acts and omissions was in dispute "because, again, [Nurse Hayes] was an agent, servant, or employee of the [professional *559 corporation] and Dr. Ware, and there is no claim of negligent supervision in this case. And they show no evidence of negligent supervision." Dr. Ware went on to state that his argument was "not evidentiary. It's a matter of law. . . . [Dr. Ware] is not legally responsible unless there is a claim for negligent supervision."
The word "again" in the objection presumably references the argument Dr. Ware's counsel made when he moved for a judgment as a matter of law at the close of the evidence. In response to the motion, Timmons's counsel informed the trial court that Timmons's theory of Dr. Ware's liability was that "Dr. Ware as the anesthesiologist is responsible . . . as a matter of law for anything that [Nurse] Hayes did or didn't do that was below the standard of care." Dr. Ware's counsel replied that Nurse Hayes "was an employee, agent, or servant of [Anesthesiology & Pain Medicine of Montgomery, P.C.,] not of Dr. Ware individually. So he would have no vicarious liability." The trial court stated that Dr. Ware was Nurse Hayes's "supervisor." Dr. Ware's counsel said: "I understand that, but there is no . . . evidence or, really, any claim of negligent supervision."
Dr. Ware provided the trial court with the ground for his objection by arguing that only an employer can be held vicariously liable for an employee's acts; thus, because Dr. Ware in his individual capacity was not Nurse Hayes's employer, but was her supervisor and co-employee, the trial court's instruction that Dr. Ware was responsible for Nurse Hayes's acts would be proper only if Timmons had pleaded negligent supervision and had introduced evidence showing that Dr. Ware had been negligent in supervising Nurse Hayes, which, Dr. Ware argued, Timmons did not do. Thus, the issue becomes whether these grounds were adequately specific to preserve the argument Dr. Ware raises on appeal.
"Requiring a party to state to the trial court the grounds for his objection to a jury instruction affords the trial court an opportunity to correct any error in its charge before it becomes error with injury to reversal." Coleman v. Taber, 572 So.2d 399, 402 (Ala.1990). Accordingly, "[g]rounds must be stated in other than general terms." Rule 51, Ala. R. Civ. P., Committee Comments on 1973 Adoption. "Although Rule 51 does not contemplate that the objecting party, in order to preserve for appellate review an erroneous instruction, deliver a discourse on the applicable law of the case, he must adequately state specific grounds for his objection." McElmurry v. Uniroyal, Inc., 531 So.2d 859, 859-60 (Ala.1988).[13]
Dr. Ware's grounds are specific enough to have preserved this issue for appellate review. When the trial court considered charging the jury that, on the basis of vicarious liability, there was no dispute that Dr. Ware was liable for Nurse Hayes's acts and omissions, the trial court had already stated that it understood that Dr. Ware's position with respect to Nurse Hayes, in his individual capacity, was that of a supervisor:
"[Dr. Ware's counsel]: . . . Lil Hayes was an employee, agent, or servant of a [professional corporation], not of Dr. Ware individually. So he would have no vicarious liability.
"The Court: Well, he took over the care [from] Dr. Fontenot I understand. So *560 whichever one was in that place, was her supervisor."
Thus, when Dr. Ware objected that Timmons was not entitled to an instruction stating that Dr. Ware was vicariously liable for Nurse Hayes's acts or omissions, arguing that Nurse Hayes was an employee of Anesthesiology & Pain Medicine of Montgomery, P.C., and that Timmons had failed to plead or introduce evidence of negligent supervision, the trial court was aware that Dr. Ware was challenging the legal basis for Timmons's proposed instruction on Dr. Ware's vicarious liability as Nurse Hayes's supervisor.
Dr. Ware reiterated his position to the trial court after the charge was read to the jury but before the jury began its deliberations:
"We also respectfully except to Your Honor's charge to the jury that if they find against Lil Hayes, they must necessarily find against Dr. Ware. We do not think that is what the law is applicable to this case. Because Dr. Ware is not necessarily vicariously liable for Ms. Hayes. There's no evidence of negligent supervision, and he's not her employee; she is not his agen[t] or employee."
Our decision that the grounds for Dr. Ware's objection were adequately specific is reinforced by the fact that Dr. Ware argued that the trial court's instruction misstated substantive law.
"Gardner v. Dorsey, 331 So.2d 634 (Ala. 1976), and Hosey v. Seibels Bruce Group, South Carolina Insurance Co., 363 So.2d 751 (Ala.1978), hold that when a party indicates in his objection to the trial court's charge the specific language of the charge he finds objectionable, and the charge misstates a point of substantive law, the issue is properly preserved for appellate review."
Snow v. Baldwin, 491 So.2d 900, 903 (Ala. 1986). Dr. Ware quoted the portion of the charge that informed the jury that he was vicariously liable for Nurse Hayes's acts or omissions, and he provided grounds asserting that the charge misstated substantive law; thus, Dr. Ware's explanation of the grounds for his objection to the jury instruction was specific enough to preserve the issue for appeal.
The issue was properly "presented to the trial court and to the opposing parties at the trial level." Birmingham Hockey Club, Inc. v. National Council on Compensation, 827 So.2d 73, 80 (Ala.2002). Dr. Ware's objections entitled him to "assign as error . . . the giving of an erroneous . . . charge." Rule 51, Ala. R. Civ. P. The record shows that the trial court "[was] apprised of its alleged error and [was] given the opportunity to act thereon." Sea Calm Shipping Co., S.A. v. Cooks, 565 So.2d 212, 216 (Ala.1990). After considering Dr. Ware's objection, the trial court decided to "give the charge." Accordingly, we hold that Dr. Ware's actions at trial preserved his alleged error for review by this Court.

VII.
Giving the jury instruction that Dr. Ware is vicariously liable for Nurse Hayes's conduct was reversible error. Absent evidence showing that Dr. Ware had the ability, in his individual capacity, to select and to dismiss Nurse Hayes, not only was Timmons not entitled to the jury instruction given by the trial court, but also, as a matter of law, the jury was not entitled to hold Dr. Ware liable based on Nurse Hayes's conduct. Thus, the trial court's erroneous instruction prejudiced Dr. Ware by affecting his substantial rights. See Rule 45, Ala. R.App. P. ("No judgment may be reversed . . . on the ground of misdirection of the jury . . . unless . . . it should appear that the error *561 complained of has probably injuriously affected substantial rights.").
"Where the record reveals that an erroneous charge was given to the jury, a new trial is required." American Cast Iron Pipe Co., 591 So.2d at 856. Because the jury rendered its verdict against Dr. Ware, Nurse Hayes, and Anesthesiology & Pain Medicine of Montgomery, P.C., without identifying the amount of each defendant's liability, the trial court's judgment entered on the verdict necessarily intertwines Dr. Ware's obligations and rights with the obligations and rights of Nurse Hayes and of Anesthesiology & Pain Medicine of Montgomery, P.C. In City of Tuscaloosa v. Fair, 232 Ala. 129, 167 So. 276 (1936), we noted:
"`The general rule is that joint judgments are to be treated as entireties on appeal, and a reversal on the appeal of one defendant will require a reversal as to both, the reason and policy of the rule being that, where the rights and obligations of the parties are necessarily blended in the judgment, and are thus dependent one upon the other, though they be not strictly joint, the appellate court will render such judgment as will permit and require the entire controversy to be settled in one proceeding, in which the rights and liabilities of all parties may be considered and consistently determined.'"
232 Ala. at 136-37, 167 So. at 282 (quoting North Alabama T. Co. v. Hays, 184 Ala. 592, 596, 64 So. 39, 40 (1913)). Accordingly, we reverse the trial court's judgment in its entirety and remand the case for a new trial.
REVERSED AND REMANDED.
STUART, SMITH, and BOLIN, JJ., and THOMPSON, Special Justice,[*] concur.
LYONS, HARWOOD, WOODALL, and PARKER, JJ., dissent.
NABERS, C.J., recuses himself.
HARWOOD, Justice (dissenting).
I dissent. The majority reverses the trial court's judgment on the basis that Johnnie Timmons, the plaintiff, failed to establish that the defendant William P. Ware, D.O., "had a right of selection" with respect to the services of a certified registered nurse anesthetist ("CRNA"), Lil Hayes ("Nurse Hayes"), also a defendant below. In so doing, the majority relies on a legal principle never asserted by the defendants to the trial court or to this Court, relies on the principle despite the fact that it has never before been asserted by this Court to be a component of the test for determining whether an individual has acted as a "loaned servant" of another, and disregards the argument on point that the defendants did assert in their briefs to this Court and at oral argument.
I will undertake to substantiate these charges that the majority in this case has departed from established appellate procedural protocols by discussing in detail the pertinent portions of the majority opinion, the caselaw cited in that opinion, what the defendants argued to the trial court about the issue, the pertinent portions of the defendants' briefs related to this issue, and what the defendants stated concerning the issue during oral argument.
The majority relies on the following statement by the former Court of Appeals in Davenport-Harris Funeral Home, Inc. v. Chandler, 38 Ala.App. 463, 466, 88 So.2d 875, 877 (1956): "`The general rule is that *562 to constitute the relationship between master and servant for the purpose of fixing liability on the former for the acts of the latter under the doctrine of respondeat superior, it is indispensable that the right to select the person claimed to be a servant should exist.'" The Court of Appeals was quoting its 1938 opinion in Motor Terminal & Transportation Co. v. Simmons, 28 Ala.App. 190, 193, 180 So. 597, 599 (1938), which had cited no authority for that proposition other than "39 Corpus Juris 1269." The question at issue in both Simmons and Chandler was whether the defendant should be liable under the doctrine of respondeat superior for the negligence of a purported subagent engaged to do certain work by an employee of a defendant who had acted in that regard without any authority from the defendant to do so.
Simmons stated that the relationship of master and servant "is to be determined, primarily, by whether or not [the purported master] had the right to control the manner of doing the work" and emphasized that there was no evidence indicating that the defendant's employee had any authority to employ a third party to serve as the agent of the defendant in handling the assignment in question. 28 Ala.App. at 192, 180 So. at 599. It was in that context that the Simmons court stated that it "was indispensable that the right to select the person claimed to be a servant should exist." 28 Ala.App. at 193, 180 So. at 599. Chandler likewise involved the issue whether the defendant should be liable for the negligence of a third party recruited by an employee of the defendant to assist in a particular matter, when the employee had no authority, express or implied, to employ an assistant. Thus, once again, the proposition that a master should have the right to select a person claimed to be his servant was expressed in the context of the right to select a subagent.
As the court elaborated in Chandler, if neither express nor implied authority was given a servant to employ another to perform or assist him in the performance of his work and the employer has not ratified the otherwise unauthorized engagement, the relation of master and servant between the employer and the third party employed by his servant does not exist, and the employer is not liable for the negligent acts of the latter under the doctrine of respondeat superior. 38 Ala.App. at 466, 88 So.2d at 877. The necessity for a right of selection on the part of the employer in a subagent situation stems from the inherently clandestine act of the agent who, without authority from or knowledge of the employer, enlists the aid of a third party. Notably, neither Simmons nor Chandler dealt with any aspect of the loaned-servant doctrine.
In addition to Chandler, the main opinion cites only State Farm Mutual Automobile Insurance Co. v. Vails, 278 Ala. 266, 270, 177 So.2d 821, 824 (1965), for the proposition that a master-servant relationship does not exist in the absence of consent. With that proposition I have no quarrel. What I do disagree with is the majority's reliance on Vails as support for equating the requirement of consent by the servant to a second relationship with a requirement of "the power to select the alleged servant" by a transferee master. Specifically, the main opinion states "[b]ecause a master-servant relationship must be consensual, to qualify as a master, one must have the power to select the alleged servant. Accord [Vails]." 954 So.2d at 552. A requirement of the power to select simply does not follow from the requirement of a consensual relationship.
In Vails, an individual who employed a domestic servant was also a member of a business corporation that had some property located in a warehouse, which needed *563 to be moved to another location. The employer of the domestic servant "agreed to lend his truck . . . for the purpose of moving this material and equipment, and agreed to obtain someone to load and unload the truck." 278 Ala. at 268, 177 So.2d at 822. The employer of the domestic servant directed that servant to help an employee of the corporation move the property. On the morning of the incident in question, the employer of the domestic servant accompanied him and the employee of the corporation "to the warehouse and instructed them in their duties." 278 Ala. at 268, 177 So.2d at 822. Later in the day, the domestic servant fell from the bed of the truck, sustaining fatal injuries. The trial court held that the domestic servant had not become an employee of the corporation because there was no evidence of any consensual relationship between the domestic servant and the corporation or its employee sufficient to create a new employer-employee relationship. This Court affirmed its judgment based on that holding. "`Where an employee enters the service of another at the command and pursuant to the direction of the master, no new relationship is necessarily created.'" 278 Ala. at 270, 177 So.2d at 824-25 (quoting Jeffrey Mfg. Co. v. Hannah, 268 Ala. 262, 265-66, 105 So.2d 672, 674 (1958)). Whatever directions the corporation's employee might have given the domestic employee during the course of their joint work was deemed to have been of no significance because the true test of the relationship is the reserved right of control, and there is a distinction "between authoritative direction and control," and the mere giving of directions. 278 Ala. at 271, 177 So.2d at 825. Vails has nothing to say about "the power to select the alleged servant"; rather, it requires only that there be a consensual relationship between the servant and the borrowing master.
As far as my research reveals, the principle stated in the sub agent context  that an employer must have the right to select the sub agent  has never before today been stated by an Alabama appellate court to have any role in determining whether there exists a direct loaned-servant relationship. This Court has had many occasions over the years to state the criteria and prerequisites of the loaned-servant relationship and has never seen fit to include "the right to select" among the factors that should be considered.
What the Court has stated time and again concerning the consensual nature of the loaned-servant relationship is that the putative servant must have "consented or acquiesced" to be in the master's service with respect to performing the particular work in question. For example, in Alabama Power Co. v. Smith, 273 Ala. 509, 520-21, 142 So.2d 228, 239 (1962), the Court explained:
"An employee may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that the employee becomes the servant of such third person with all the legal consequences of the new relation."
This same "consent or acquiescence" formulation of the test of consensuality has been repeated in Hendrix v. Frisco Builders, Inc., 282 Ala. 473, 476, 213 So.2d 208, 211 (1968); Coleman v. Steel City Crane Rentals, Inc., 475 So.2d 498, 501 (Ala. 1985); and United States Fidelity & Guaranty Co. v. Russo Corp., 628 So.2d 486, 488 (Ala.1993).
In Defoor v. Evesque, 694 So.2d 1302, 1304 (Ala.1997), the Court listed among the criteria for determining the existence of a loaned-servant relationship, "whether the employee consented to becoming the `borrowed servant' of the alleged borrower *564 . . . ." The Court cited Russo Corp., supra, in that regard, indicating that its reference to "consent" was simply a shorthand reference for the well-established requirement, reiterated in Russo Corp., that the employee consent or acquiesce to enter into the service of the alleged borrower. The majority opinion acknowledges the flexible nature of this concept of consent in its quotation of Restatement (Second) of Agency § 1 cmt. a (1958):
"`The relation of agency is created as a result of conduct by two parties manifesting that one of them is willing for the other to act for him subject to his control, and that the other consents so to act. The principal must in some manner indicate that the agent is to act for him, and the agent must act or agree to act on the principal's behalf and subject to his control.'"
954 So.2d at 552.
Nurse Hayes clearly consented or acquiesced to work under the supervision and direction of Dr. Ware with respect to administering anesthesia to Brandi Timmons and monitoring Brandi during and immediately following surgery. As the majority opinion notes, § 34-21-81(4)(c), Ala.Code 1975, requires that a CRNA, like Nurse Hayes, "function[] under the direction of a physician licensed to practice medicine, or a dentist, who is immediately available." As the majority opinion also notes, the procedural manual of Baptist Medical Center East, where Brandi's surgery was performed, required "all anesthesia care . . . to be directed by a qualified physician anesthesiologist." At all times pertinent to this action, the regulations of the Alabama Board of Nursing provided that "[t]he nurse anesthetist functions under the direction of a duly licensed physician or dentist." Ala. Admin. Code (Nursing) § 610-X-9-01 (repealed and new rule adopted effective September 29, 2003). Nurse Hayes agreed in her testimony that a CRNA follows whatever directions the anesthesiologist may give during the medical procedure and operates under the supervision and direction of the anesthesiologist; she also agreed that the supervising anesthesiologist was responsible for what the CRNA does in the care of the patient. Thus, it is clear that Nurse Hayes consented or acquiesced to enter into the service of Dr. Ware in connection with the anesthesiological services she performed; it would have been legally impermissible for her to attempt to render such services independent of his supervision and direction.
In Williams v. Central of Georgia Ry., 220 Ala. 298, 299, 124 So. 878, 878 (1929), this Court explained that a loaned servant is deemed the servant of the one to whom he is lent, "`although he remains the general servant of the person who lent him'" (quoting Ronoke v. Colliery Co., 2 C.P. Div. 205). Therefore, although Nurse Hayes remained the general servant of Anesthesiology & Pain Medicine of Montgomery, P.C., that professional corporation could not direct her as to the means and methods she employed in administering anesthesia to Brandi Timmons and her postoperative surveillance of that patient. Only Dr. Ware, as Brandi's anesthesiologist, could delegate to Nurse Hayes various aspects of Brandi's anesthesiology care, and the professional corporation could not legally have interfered with the means and methods used by Nurse Hayes, as directed and supervised by Dr. Ware. The majority opinion states "[t]he trial court's instruction that Dr. Ware is liable as a matter of law for the acts and omissions of Nurse Hayes was correct only if Timmons had introduced evidence of both elements of respondeat superior liability on the part of Dr. Ware, namely, that Dr. Ware and Nurse Hayes had voluntarily *565 entered into their relationship and that Dr. Ware possessed a reserved right of control." 954 So.2d at 553. Again, I have no quarrel with this proposition.
Concerning the right of control, and in otherwise undertaking to state, with purported completeness, the appropriate test for determining whether a servant in the general employ of one party has become, for the time being, the servant of another as special master, this Court has had the following to say:
"In such a case, the results will be determined by the answer to the questions: whose work was the servant doing and under whose control was he doing it? And it is the reserved right of control rather than the actual exercise that furnished the true test of relationship. He is master who has the supreme choice, control, and direction of the servant and whose will the servant represents in the ultimate result and in all its details."
United States Steel Corp. v. Mathews, 261 Ala. 120, 123, 73 So.2d 239, 242 (1954) (citations omitted). See to like effect Martin v. Anniston Foundry Co., 259 Ala. 633, 68 So.2d 323 (1953); Alabama Power Co. v. Smith, supra; Hendrix v. Frisco Builders, Inc., supra; and Dumas v. Dumas Bros. Mfg. Co., 295 Ala. 370, 330 So.2d 426 (1976).
"The ultimate test in determining whether an employee has become a loaned servant is a determination of whose work the employee was doing and under whose control he was doing it. See Coleman v. Steel City Crane Rentals, Inc., 475 So.2d 498 (Ala.1985), cert. denied, Illinois Central Gulf R.R. Co. v. Coleman, 476 U.S. 1104, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986). It is the reserved right of control, rather than the actual exercise of control, that furnishes the true test of the relationship. Id. `Power to control determines responsibility.' Martin v. Anniston Foundry Co., 259 Ala. [633,] 637, 68 So.2d [323,] 328 [(1953)]."
Russo Corp., 628 So.2d at 489.
In Hauseman v. University of Alabama Health Services Foundation, 793 So.2d 730 (Ala.2000), which will be discussed later in this dissent, the Court stated:
"This Court has held that an employee in the general employment of one master may become a `loaned' or `borrowed' servant of a special or second master and that the special master may be held vicariously liable for the torts of the borrowed servant. See United States Fidelity & Guar. Co. v. Russo [Corp.], 628 So.2d 486 (Ala.1993); Hendrix v. Frisco Builders, Inc., 282 Ala. 473, 213 So.2d 208 (1968).
"`In determining whether an employee has become a loaned servant the ultimate test is: Whose work was the employee doing and under whose control was he doing it[?] Dumas v. Dumas Brothers Manufacturing Co., 295 Ala. 370, 378, 330 So.2d 426, 432 (1976). It is not the actual exercise of control which is determinative but rather the reserved right to control the employee. United States Steel Corp. v. Mathews, 261 Ala. 120, 123, 73 So.2d 239, 242 (1954). Where the work of the employee is part of a large undertaking, mere suggestions as to details necessary for a cooperative effort must be distinguished from actual authoritative direction and control. 261 Ala. at 124, 73 So.2d at 242.'
"Coleman v. Steel City Crane Rentals, Inc., 475 So.2d 498, 500 (Ala.1985), cert. denied sub nom. Illinois Cent. Gulf R.R. v. Coleman, 476 U.S. 1104, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986)."
793 So.2d at 736.
The evidence is overwhelmingly clear to the fact that Dr. Ware had "the supreme *566 choice, control, and direction" of Nurse Hayes and it was his will she represented "in the ultimate results and in all of its details."
The following evidence in this case is relevant to these considerations:
Dr. Ware testified that at the time of Brandi's surgery, he "practiced with an anesthesia team," which "involve[d] both physicians and CRNAs." Dr. Ware explained that a particular anesthesiologist and a particular CRNA would initially be assigned to a case and would review it together, and if he was the anesthesiologist originally scheduled to oversee a patient's anesthesiology care, he and the assigned CRNA
"would both be there for induction. After induction, if everything was okay, I would leave. The CRNA would stay there. Then at any time during this process that she needed me, I was obviously available for her to call or him to call. Then with extubation, I would go back in there and we would extubate the patient."
In between induction and extubation, the anesthesiologist "periodically will just voluntarily go in a room and check on a patient."
Dr. Ware was not the anesthesiologist originally assigned to oversee Brandi's anesthesiology, however. He testified that "[i]nitially, I think Dr. Wesley Robertson did the induction on [Brandi] and put an A-line in her. Dr. [Wilfred] Fontenot sort of managed the entire case, and I was present during extubation." Dr. Ware had no specific recollection of how he came to take over Brandi's case from Dr. Fontenot, but stated that "I assume that Dr. Fontenot came to me and said, you know `I have this case in Room III and, you know, everything is going fine, no problems.'" Dr. Ware makes this assumption because, he stated: "I just know in general we would have had a conversation about the cases that would be present in OR [the operating room] if someone is going to leave the OR suite." At any rate, he says, "I assumed responsibility. I was on call and took over the cases." He further stated: "At any time they need us, we will be available."
Testifying by videotaped deposition, Dr. Wilfred Fontenot identified himself as "the anesthesiologist of record" for Brandi. He had a clearer recollection of the transfer of anesthesiological oversight of Brandi, explaining that he had asked Dr. Ware to relieve him because "it was the beginning of a  the holiday and the OR room had come down to such a level that it was an appropriate time for me to be relieved for me to go home exactly." Dr. Fontenot left at 11:15 a.m. and as of that time, "[e]verything had been fine throughout the term of [his] responsibility." He was "gone for the day" and did not again become responsible for Brandi; he was attending a holiday social at a nearby physician's office, and he rushed back to the operating room when he was notified of the "code" called for Brandi. For her part, Nurse Hayes testified that she had no recollection of how she came to relieve the CRNA who had started Brandi's anesthesiological care with Dr. Fontenot and did not recall having any conversation with any doctor about taking over for the assigned CRNA. Nurse Hayes explained that she would have been providing "lunch relief" for the CRNA, because, she says, "we usually try to  you know, take care of each other, see that everybody gets to eat." There is no schedule that provides who will relieve whom and no particular person who makes that decision. Nurse Hayes testified that the decision that she substitute for the assigned CRNA could have been entirely Nurse Hayes's decision.
*567 Dr. Fontenot explained that a CRNA "follows whatever directions I might be giving them during a case and makes independent decisions when they feel they are not in need of my assistance"; that they "operate under the supervision and direction of the doctor anesthesiologist"; and that he as the anesthesiologist is "responsible" for what the CRNA does in the care of the patient. Counsel for Timmons, quoting to Nurse Hayes the testimony of Dr. Fontenot, elicited the following testimony from her:
"[Counsel for Timmons]: . . . [T]he CRNA follows whatever directions the anesthesiologist may give during the case and makes independent decisions when they feel they are not in need of any assistance. Do you agree with that?
"[Nurse Hayes]: Yes, sir.
"[Counsel for Timmons]: . . . [T]he CRNA operates under the supervision and direction of the anesthesiologist?
"[Nurse Hayes]: In our particular situation, yes sir.
"[Counsel for Timmons]: And on the day that Brandi was operated on 
"[Nurse Hayes]: Yes, sir.
"[Counsel for Timmons]:  that was the case, wasn't it?
"[Nurse Hayes]: Yes, sir.
"[Counsel for Timmons]: You were operating under the supervision and direction of the anesthesiologist, Dr. Ware?
"[Nurse Hayes]: Yes, sir.
"[Counsel for Timmons]: The physician is responsible for what the CRNA does in and about the care of the patient. Do you agree with that?
"[Nurse Hayes]: Yes, sir."
Dr. Ware also acknowledged in his testimony that CRNAs carry out the orders of the anesthesiologist and that the anesthesiologist supervises the care of the patient, even when the anesthesiologist is not in the room with the patient:
"[Counsel for Timmons]: [The policy and procedure manual for Baptist Medical Center East's anesthesia department] says, `The hospital has determined that it is in its best interest for all anesthesia care to be directed by a qualified physician anesthesiologist.'
". . . .
"Regardless of whether the anesthesiologist may be directly in the room at all times; nonetheless, you're in a supervisory role?

"[Dr. Ware]: Yes, sir.

". . . .
"[Counsel for Timmons]: If you gave an instruction to a CRNA  you or anybody else within that department  as a matter of policy and practice and custom and practice, would you expect that the CRNA would adhere to the order you gave them?

"[Dr. Ware]: Yes."
(Emphasis added.)
After Dr. Ware stated that both he and Nurse Hayes were responsible to the patient, counsel for Timmons asked, "bottom line, you were the one responsible, not [Nurse Hayes]. . . . Aren't you responsible for her?" Dr. Ware responded, "I think we are both responsible. Yes, I am." (Emphasis added.)
When Nurse Hayes determined that the time was right to extubate Brandi, she had the circulating nurse summon Dr. Ware to oversee the process. He arrived and supervised the extubation. When Nurse Hayes thereafter transported Brandi to the postanesthesia care unit ("the PACU"), Dr. Ware walked part of the way with them but then detoured into another room to evaluate a preoperative patient. When counsel for the defendants asked him if he *568 nevertheless remained available as needed, Dr. Ware replied, "Yes. I was just like through a door, that wall over there. I was through that wall." He also testified that he was "within yelling distance." When Brandi's condition deteriorated in the PACU, Nurse Hayes told a nurse who was present "to call Dr. Ware stat," and he arrived within seconds. Dr. Ware testified that after he was summoned and entered the PACU, he gave Nurse Hayes orders to ensure that Brandi was properly ventilated and he was otherwise "in charge of [the] code."
Dr. Marvin Simons, presented by the defendants "as an expert in the field of anesthesia care," testified concerning the interactions of anesthesiologists and CRNAs. Once again referring the witness to Dr. Fontenot's deposition testimony, counsel for Timmons asked Dr. Simons if a CRNA "follows whatever directions the anesthesiologist may give during the case and makes independent decisions when they feel they're not in need of any assistance. . . . operates under the supervision and direction of the anesthesiologist. . . . the physician is responsible for what the CRNA does in and about the care of the patient." Dr. Simons responded affirmatively on all counts. Timmons's two expert-witness anesthesiologists and her expert-witness CRNA gave similar testimony.
Accordingly, only one inference can possibly be drawn from this body of evidence: In the hospital setting, Dr. Ware, as the supervising anesthesiologist, reserved the right to control the work of Nurse Hayes. He, as a licensed anesthesiologist, individually could provide all aspects of anesthesia care without supervision; he could also relinquish various aspects of that care to Nurse Hayes as a CRNA functioning under his direction. Nonetheless, he had the supreme choice, control, and direction of Nurse Hayes.
The majority opinion agrees that "the only rational conclusion to be drawn from the evidence presented at trial" was that Nurse Hayes was "under the supervision and control of Dr. Ware." 954 So.2d at 554. The majority goes on to require, however, as an additional element, never before included in any of the formulations by this Court of "the ultimate test" for determining loaned-servant status, that it be affirmatively proved that the special master had the right to select the person serving as the loaned servant. Despite the fact that no opinion of this Court has ever included this element as a required feature of the proof of a loaned-servant relationship, the majority today presumes to reverse a trial court's judgment because the judge was not prescient enough to anticipate that the majority might seize upon this notion as an "indispensable" feature of the required proof. Certainly, the trial judge, assuming he had read all of our caselaw on point, would not have foreseen the importance the majority today attaches to this idea, which it has extracted from two "subagent" cases of the former Court of Appeals. As it is, the majority raises this issue of "right of selection" completely on its own, without even the most indirect allusion to its having been made before the trial court, without any reference to its being included in the appellants' two briefs to this Court, and without any reference to its having been made by the appellants at oral argument. It is passing strange that a matter to which the majority now attaches determinative significance so completely escaped the attention of the defendants, so completely escaped the attention of this Court in all of its prior analyses of the elements of the loaned-servant doctrine, and so completely escaped the attention of this entire Court at oral argument *569 that no Justice asked any question or offered any comment about it.
As noted in the majority opinion, defense counsel, arguing to the trial court on behalf of Dr. Ware's motion for a judgment as a matter of law and in response to the theory of the case advanced by Timmons's counsel that "Dr. Ware as the anesthesiologist is responsible . . . as a matter of law for everything that [Nurse] Hayes did or didn't do that was below the standard of care," asserted that Nurse Hayes was an employee, agent, or servant of the professional corporation and not of Dr. Ware individually; defense counsel responded to the trial court's reference to Dr. Ware as Nurse Hayes's supervisor by explaining simply: "`[T]here is no . . . evidence or, really, any claim of negligent supervision.'" 954 So.2d at 559. (Emphasis added.) It is to be noted that Timmons's counsel clearly stated on this occasion, as they did on numerous other occasions in dialogues with the court and defense counsel, that they were relying on the specific anesthesiologist-CRNA relationship existing between Dr. Ware and Nurse Hayes. At no time did Timmons's counsel attempt to premise Dr. Ware's liability for Nurse Hayes's negligence on the fact that she was an employee of the professional corporation, or that they were co-employees of that entity.
As the majority opinion also notes, when the parties addressed the propriety of the jury instruction now at issue during the charge conference, counsel for the defendants argued against the instruction, stating that Dr. Ware's responsibility for the acts and omissions of Nurse Hayes was indeed disputed "`because, again, [Nurse Hayes] was an agent, servant, or employee of the [professional corporation] and Dr. Ware, and there is no claim of negligent supervision in this case. And they show no evidence of negligent supervision.'" (Emphasis added.) 954 So.2d at 558-59. When counsel for Timmons countered that it was "undisputed, uncontested that the physician is responsible for what the CRNA does in and about the care of the patient," there having been no evidence to contrary, defense counsel argued: "It's not evidentiary. It's a matter of law is what it is. [Dr. Ware] is not legally responsible unless there is a claim for negligent supervision."
Thus, inconsistent with defense counsel's statement in support of the motion for a judgment as a matter of law, defense counsel stipulated to the trial judge at the charge conference that Nurse Hayes was an agent, servant, and employee of both the professional corporation and Dr. Ware, arguing in opposition to the proposed jury charge that there was no claim of, nor was there evidence of, negligent supervision.
After the charge had been given, the defendants registered several objections to it, including the fact that defense counsel did not "think that is what the law is applicable to this case. Because Dr. Ware is not necessarily vicariously liable for [Nurse] Hayes. There is no evidence of negligent supervision, and he's not her employee; she is not his agen[t] or employee."
Based on all of this, should we now hold the trial judge in error because, without any argument or guidance to the contrary from the parties, he failed to incorporate, on his own initiative, a "right to select" requirement in the jury instructions? To demand this of a trial judge is to expect that he should ignore the various statements this Court has offered over the decades of "the ultimate test" for determining a loaned-servant relationship, none of which has ever suggested that the "right to select" is a required component of the analysis. In footnote 13, the majority states:

*570 "[E]rror below does not suggest a shortcoming on the part of the trial judge. The principal function of the appellate courts is to ensure a measure of uniformity in the law, availing themselves of the research, analysis, and debate for which trial courts have neither the resources nor the time."
954 So.2d at 559.
Had the trial judge thoroughly researched our loaned-servant caselaw  and we have no reason to presume that he did not  he would not have come across the "test" the majority now applies to hold him in error. Although the majority acknowledges in the introductory paragraphs of Part VI of the opinion that our caselaw is clear to the fact that we will not consider arguments raised for the first time on appeal; that our review is restricted to the evidence and arguments presented to and considered by the trial court; that to preserve a jury-instruction issue for appellate review, the alleged error must have been brought to the trial court's attention and ruled upon; and that we cannot put a trial judge in error for failure to rule on a matter that has never been presented to nor decided by him, the majority proceeds to conclude that the trial judge was adequately alerted by the above-quoted statements of defense counsel that the "right to control" test must be coupled with a "right to select" test. ___ So.2d at ___. I cannot agree that the trial judge was adequately apprised of this legal notion the majority today inaugurates as a required element of proof in establishing a loaned-servant relationship, and I would not reverse the trial judge's judgment on that basis.
Moreover, and moving from the requirements of preservation of error at the trial level to the requirements of specific argument at the appellate level, the defendants have offered no argument in their briefs to this Court or at oral argument to the effect that a plaintiff seeking to establish a loaned-servant relationship must prove, in addition to a "right to control," a "right to select."
Although it is an accepted principle of appellate review that we will affirm a trial court's ruling for any reason, subject to due-process "notice" considerations, e.g., Liberty Nat'l Life Ins. Co. v. University of Alabama Health Servs. Found., P.C., 881 So.2d 1013, 1020 (Ala.2003), it is equally well established that an appellate court will reverse a ruling of a trial court only on the basis of error preserved below and properly argued to the appellate court. E.g., Yellow Dog Dev., LLC v. Bibb County, 871 So.2d 39, 41-42 (Ala.2003). In that regard, an appellant is at liberty, absent overriding public-policy concerns, to select and shape the contours of the appellate issues any way he, she, or it chooses. Avis Rent A Car Sys., Inc. v. Heilman, 876 So.2d 1111, 1124 (Ala.2003); Bagley v. Mazda Motor Corp., 864 So.2d 301, 311 (Ala.2003); Smelser v. Trent, 698 So.2d 1094, 1095 (Ala.1997); Springer v. Jefferson County, 595 So.2d 1381, 1383 (Ala. 1992); and Ingalls v. Ingalls, 259 Ala. 80, 81, 65 So.2d 199, 200 (1953). A party's explicit admissions in an appellate brief are binding on the party. Best Plant Food Prods., Inc. v. Cagle, 510 So.2d 229 (Ala. 1987); Louisville & N.R.R. v. Johns, 270 Ala. 694, 121 So.2d 872 (1960); and First Nat'l Bank v. Town of Luverne, 235 Ala. 606, 180 So. 283 (1938).
Therefore, it is important that this Court focus on what the defendants have argued in their briefs to this Court and subsequently at oral argument. Have they argued in any fashion that the "right to select" is a required component of a plaintiff's burden of proof concerning the applicability of the loaned-servant doctrine? To demonstrate that they have not, I first set out the entirety of that portion *571 of the defendants' argument in their principal brief relating to the applicability of the loaned-servant doctrine:
"This charge [concerning Dr. Ware's responsibility for any acts and/or omissions of Nurse Hayes] is incorrect. In fact, contrary to this charge, whether Dr. Ware was responsible for the acts and omissions of [the] CRNA was `in dispute.' [Timmons's] counsel argued at trial that `it's been undisputed, uncontested that the physician is responsible for what the CRNA does in and about the care of the patient.' However, counsel for the defendant[s] advised the judge, prior to the charge, that this claim of agency or respondeat superior was `very much in dispute.' Because that issue was in dispute, it was error for the trial court to remove that issue from the jury's consideration.
"It was agreed among counsel for all parties that Nurse Hayes was not the agent, servant or employee of Dr. Ware. Rather, she was the agent, servant and employee of Anesthesiology & Pain Medicine of Montgomery, P.C. (Hereinafter referenced as `the P.C.'). In fact, it was stipulated among the parties that Dr. Ware and Nurse Hayes were co-employees of the P.C. The only legal theories under which the Court could have taken this issue from the jury were that of negligent supervision or the loaned servant doctrine. It should be noted that [Timmons] did not argue either of these theories in response to the objections by defense counsel to the charge at issue. However, even if those theories had been raised by [Timmons's] counsel, each would fail under the facts of this case.
". . . . [Argument relating specifically to the elements of a claim for negligent supervision omitted.]
"It is certainly true that, under Alabama law, one who is technically not the employer of another may become liable for the acts or omissions of that other individual under the appropriate application of the `loaned servant doctrine.' Hauseman v. [University of Alabama Health Servs. Found.], 793 So.2d 730, 736 (Ala.2001). Hauseman involved a claim of medical negligence in which it was proposed that the defendant Pacifico was liable for the acts or omissions of a resident physician who was Dr. Pacifico's `"loaned" or "borrowed" servant.' Id. However, this Court went on to say in Hauseman that `[w]hether one who is usually and normally the servant of one master has become specially and temporarily the servant of another . . . is ordinarily a question of fact.' Id. quoting United States Steel Corp. v. Mathews, 261 Ala. 120, 123, 73 So.2d 239, 241 (1954)(emphasis added). In the instant matter, there is no evidence which suggests that the facts in this case take any claim of a loaned or borrowed servant out of the `question of fact' category and into the `question of law' category. Dr. Ware and Nurse Hayes each had separate `responsibilities.' Further, many of the standard of care criticisms of Nurse Hayes by Plaintiff's expert, CRNA Embry, were of care, treatment and judgments rendered by Nurse Hayes in the PACU when Dr. Ware was not physically present and not involved in those decisions. Clearly, therefore, any issue of Nurse Hayes as the loaned or borrowed servant of Dr. Ware, `even if it had been raised,' was a question of fact for the jury."
(References to the record omitted.)
Dr. Ware accurately quotes from Hauseman its quote from United States Steel Corp. v. Mathews, 261 Ala. at 123, 73 So.2d at 241, that "ordinarily" whether one has become a loaned servant is "a question of *572 fact." That statement in Mathews is immediately followed, however, by one explaining that the issue can be a question of law. The full statement in Mathews is as follows:
"It has been said that `whether one who is usually and normally the servant of one master has become specially and temporarily the servant of another . . . is ordinarily a question of fact. If under the circumstances only one inference can properly be drawn, the court will determine it, but if reasonable men may fairly come to different conclusions respecting the inference to be drawn from the fact, the case will be one for the jury.' 2 Mechem on Agency 1447, § 1864."
261 Ala. at 123, 73 So.2d at 241-42.
To like effect is this statement in Russo Corp., 628 So.2d at 488-89:
"`"Whether one who is usually the servant of one master has become specially and temporarily the servant of another is ordinarily a question of fact. If, under the circumstances only one inference can be properly drawn, the court will determine the issue, but if reasonable men may fairly come to different conclusions respecting the inference to be drawn from the facts the case will be one for the jury."'"
(Quoting Hendrix, 282 Ala. at 476, 213 So.2d at 211, in turn quoting Alabama Power Co. v. Smith, 273 Ala. at 521, 142 So.2d at 239.)
In Russo Corp., the Court concluded that the facts were such that "only one inference could be properly drawn from the evidence," 628 So.2d at 489  that the general employee of one party had become temporarily the loaned servant of another, despite continuing to be paid by the general employer.
This Court has long held:
"`Whenever the evidence upon a given subject is without dispute and only one rational conclusion can be drawn from such evidence, then the trial judge, at the written request of either of the parties to the cause, may charge the jury as to the effect of such evidence, and he will not be put in error for so doing.
". . . `When the facts are such that all reasonable conclusions to be drawn from them are the same, they present a mere question of law for the court.'"
Batson v. Birmingham Trust & Sav. Co., 241 Ala. 629, 632, 4 So.2d 307, 310 (1941)(quoting Riley v. Fletcher, 185 Ala. 570, 578, 64 So. 85, 88 (1913), and Western Union Tel. Co. v. Perry, 3 Ala.App. 247, 251, 56 So. 824, 826 (1911)).
In fact, in addition to doing so in Russo Corp., this Court held in Hendrix, supra, and ATS, Inc. v. Beddingfield, 878 So.2d 1131 (Ala.2003), that the issue whether an individual was serving as the loaned servant of another was determinable as a matter of law under the evidence. In none of those cases did this Court give any consideration to a "right to select" on the part of the putative special master.
What is it that the defendants argue in their briefs, in the final analysis, concerning the applicability of the loaned-servant doctrine and its susceptibility to determination as a question of law under the evidence in this case?
First, they argue that plaintiff's counsel did not raise the theory of the loaned-servant doctrine. However, I note:
"In any civil action, it shall be permissible to allege in any pleading that any party or parties committed an act, and proof that any such party or parties committed such act by or through an agent, servant, or employee acting within the line and scope of his employment shall be sufficient proof of such allegation. . . . "
*573 § 6-5-300, Ala.Code 1975. See also Sibley v. Adams, 56 Ala.App. 572, 576, 324 So.2d 287, 289 (1975)(citing Aggregate Limestone Co. v. Robison, 276 Ala. 338, 342, 161 So.2d 820, 824 (1964))("[I]t is permissible in any case to aver that defendant committed an act and at trial prove that the act was committed by or through an agent, servant or employee acting within the line and scope of his employment."). Timmons's complaint avers that the defendants were guilty of various acts and omissions that constituted medical malpractice, a number of which related only to the conduct of Nurse Hayes; the pleading asserting that Dr. Ware committed those acts or omissions could be referable only to a theory of respondeat superior, of which the loaned-servant doctrine is a well-established component.
Next, the defendants affirmatively acknowledge the potential applicability to this case of the loaned-servant doctrine, citing Hauseman, supra, and then argue only that the evidence in the case rendered resolution of that issue a question of fact to be decided by the jury, rather than a question of law to be determined by the trial judge. In that regard, the defendants go on to cite as the particular features of the evidence they contend serve to take the "claim of loaned or borrowed servant" out of the question-of-fact category, only (1) that Dr. Ware and Nurse Hayes each had separate responsibilities and (2) that many of the standard-of-care criticisms of Nurse Hayes by Timmons's expert related to "care, treatment, and judgments rendered by Nurse Hayes in the PACU when Dr. Ware was not physically present and not involved in those decisions." Defendants then state: "Clearly, therefore, any issue of Nurse Hayes as the loaned or borrowed servant of Dr. Ware, even if it had been raised, was a question of fact for the jury." (First emphasis added.) Thus, defendants' arguments on point, occupying less than two and one-half pages of their 84-page principal brief, are reducible to these, and only these, contentions: That the loaned-servant doctrine is not available to Timmons because it was not raised by her; and that, even if it had been raised, it represented a question of fact for the jury, rather than a question of law for the trial judge, because Dr. Ware and Nurse Hayes had separate responsibilities and many of the standard-of-care criticisms of Nurse Hayes related to her conduct in the PACU when Dr. Ware was not physically present and not directly involved in the decision-making.
Where in any of this do we find a basis for the majority to identify reversible error predicated on a supposed absence of proof of Dr. Ware's "right to select" Nurse Hayes as the CRNA who assisted him?
The fact that Dr. Ware and Nurse Hayes had separate responsibilities is of no consequence because, as previously discussed, he had authoritative control over all of her activities and thus was "responsible" for Nurse Hayes's "responsibilities." Likewise, the fact that many of the standard-of-care criticisms of Nurse Hayes by Timmons's expert related to "care, treatment, and judgments" by her at a point when Dr. Ware was not physically present is irrelevant because, as also earlier noted, Nurse Hayes was required by statute at all times to be functioning under Dr. Ware's direction and he was to be "immediately available"; also, Dr. Ware has testified that "regardless" of whether he was "directly in the room at all times," he was nonetheless at all times in a supervisory role. Nurse Hayes likewise testified that she was at all times operating under Dr. Ware's supervision and direction and that he was responsible for what she, as the CRNA, did in the care of the patient. Thus, the only issues of fact that the defendants identify in their principal brief as *574 taking the resolution of the loaned-servant issue out of the question-of-law category are not material issues of fact. Defendants simply have not established cognizable reversible error by their argument in their principal appellate brief concerning the loaned-servant issue.
The only additional argument on this issue, which the defendants present in their reply brief, is that it was error for the trial court to charge the jury that Dr. Ware was vicariously liable for the acts of Nurse Hayes "because [Timmons] did not assert any claim for vicarious liability against Dr. Ware as required under § 6-5-551[, Ala.Code 1975]." Although the defendants assert in their reply brief that "this fundamental oversight was raised by [the] Defendants," they acknowledge that they raised the issue only by arguing to the trial judge that there could be no vicarious liability unless there was a claim of negligent supervision. (Defendants' reply brief, p. 26.)
What § 6-5-551 in fact requires is that a plaintiff's complaint in a medical-malpractice action provide "a detailed specification and factual description of each act and omission alleged by plaintiff to render the health care provider liable to the plaintiff," including, when feasible, the date, time, and place of the act or acts.
"Any complaint which fails to include such detailed specification and factual description of each act and omission shall be subject to dismissal for failure to state a claim upon which relief may be granted. Any party shall be prohibited from conducting discovery with regard to any other act or omission or from introducing at trial evidence of any other act or omission."
§ 6-5-551, Ala.Code 1975. Dr. Ware does not argue that the complaint failed to include a sufficient factual description of each act or omission relied on by Timmons and does not argue that a motion to dismiss should have been granted or that there was any admission of evidence improper under § 6-5-551. As previously explained, the loaned-servant doctrine was available under the pleadings as a legal theory on which to predicate vicarious liability. Moreover, because the defendants never raised the supposed noncompliance with § 6-5-551 before the trial court and do so now only in their reply brief, they have, for that reason also, not preserved or properly presented any claim of error in that regard. Lloyd Noland Hosp. v. Durham, 906 So.2d 157, 173 (Ala.2005) (this Court will not reverse a trial court's judgment based on an argument not presented to that court and will not consider an issue not raised in an appellant's initial brief, but raised only in the reply brief).
At oral argument, counsel for the defendants argued that the "right of control" test was the determinative aspect of the loaned-servant issue. Among other things, defense counsel asserted that "the test for agency, for vicarious liability, is not set by that statute [§ 34-21-81(4)(c), Ala.Code 1975]; it's set by the law and the law is clear and it cannot be denied: it's the right to exercise the ultimate right of control and the ultimate right of control here belonged to their [i.e., Dr. Ware and Nurse Hayes's], employer." Counsel argued that two co-employees, both acting in the line and scope of their employment, cannot become the loaned servant of each other, asserting as a follow-up: "The fact that one is permitted to superintend the CRNA does not make the CRNA the agent of the one superintending; the ultimate right of control lies with the employer." Therefore, according to defense counsel, because Nurse Hayes and Dr. Ware were co-employees, "it was their employer, the professional corporation, who exercised the supreme right of control over them as a *575 matter of law," there being "no evidence that the professional corporation ever relinquished it supreme right of control over Nurse Hayes to Dr. Ware."
In explaining the right-of-control test, which defense counsel asserted that "this Court has repeatedly recognized, in case after case," counsel quoted from Hendrix, supra, the statement, "He is master who has the supreme choice, control and direction of the servant and whose will the servant represents in the ultimate result and in all its details." 282 Ala. at 476, 213 So.2d at 210. Counsel then continued, arguing that the "mere right to supervise" is not the equivalent of the "right to control" and that the fact that Dr. Ware was permitted to superintend Nurse Hayes did not make her his agent because "the ultimate right of control lies with the employer." According to defense counsel, Dr. Ware was not exercising a personal right of control over Nurse Hayes but one "delegated to him by their common employer."
At no time during the entire oral argument did counsel for the defendants, or any member of this Court, suggest that, in addition to the "right to control," there must be separately proven, as a second prong of the proof required to establish a loaned-servant relationship, the "right to select."
Timmons has been clear at all times, both before the trial court and this Court, in distinguishing between the relationship Dr. Ware and Nurse Hayes had as co-employees of the professional corporation and their relationship as supervising anesthesiologist and supervised CRNA. The two relationships are separate and independent. For purposes of analysis, Nurse Hayes could just as well have been the employee of another anesthesiology group or could have been working as a freelance CRNA, without any connection with the professional corporation, simply being assigned to work under Dr. Ware's direction on the occasion in question. Such was the situation in Harris v. Miller, 335 N.C. 379, 438 S.E.2d 731 (1994), in which the Supreme Court of North Carolina held that a CRNA could be deemed the borrowed servant of the supervising surgeon (the hospital did not employ a staff anesthesiologist and no anesthesiologist was available for consultation within 30 miles) when the CRNA was considered by the hospital's manual on anesthesia to be working under the "responsibility and supervision" of the surgeon. The CRNA in question was employed by the hospital and was assigned by its chief anesthetist to assist the surgeon in the operation in question.
The majority opinion ignores the critical distinction between the relationship actually at issue in this case  that of directing anesthesiologist and directed CRNA, on the one hand, and the separate relationship of Dr. Ware and Nurse Hayes as co-employees of the professional corporation, on the other. Their relationship as co-employees is incidental, and totally irrelevant, to their specific relationship at issue in this case of supervising anesthesiologist and supervised CRNA. The majority ignores that fact, however, and elects to proceed on the assumption that it is the co-employee relationship that must be looked to in evaluating the loaned-servant issue. For example, the majority states that "the propriety of the trial court's instruction concerning Dr. Ware's liability hinges upon whether Dr. Ware  as an individual whose right to control a servant stems from his own status as a servant to the same employer  satisfies the common-law definition of a master." 954 So.2d at 551-52. Similarly, the majority asserts that the evidence permits, if not compels, "the rational conclusion that Dr. Ware's right of control over Nurse Hayes's conduct arose from his supervisory position as *576 her co-employee at Anesthesiology & Pain Medicine of Montgomery, P.C." 954 So.2d at 555. The majority then exploits these false premises to build its case, going on to discuss the legal implications of "the co-employee" context, the relationship of "co-employees," and the idea that if Dr. Ware "merely controlled Nurse Hayes's acts in his capacity as a co-employee" of the professional corporation, and as her company supervisor, he would not be liable "by virtue of that relationship" under the doctrine of respondeat superior. 954 So.2d at 556. The majority opinion thus pursues a red herring through legal reasoning substantively inapplicable to the actual relationship between Dr. Ware and Nurse Hayes. Dr. Ware's right of control over Nurse Hayes did not arise out of their relationship as co-employees and was not delegated to him by the professional corporation; it arose out of their separate and independent relationship as supervising anesthesiologist and supervised CRNA.
Accordingly, my analysis in this dissent has no implications for conventional intracompany supervisor/subordinate relationships, or the usual "chain of command" flow of responsibilities in a business or corporate setting. I focus solely on the singular and unique relationship and interaction between a paired anesthesiologist and CRNA, based on the dynamics peculiar to that relationship. Concerning the "right of control" that attended that relationship, one need only ask what would have happened if the business manager of the professional corporation had attempted to instruct Nurse Hayes temporarily to depart from Brandi's care in order to attend to some business concern for the professional corporation, contrary to instructions from the supervising anesthesiologist. Obviously, no corporate entity, whether a professional corporation or otherwise, can presume to practice medicine or interfere with the relationship between caregiver and patient. The professional corporation could not direct or supervise Nurse Hayes in the care she provided Brandi. Only Dr. Ware, as directing anesthesiologist, had that "right of control."
I do not by anything I have said in this dissent champion as an abstract proposition the applicability of the loaned-servant doctrine to the interrelationship of a supervising doctor and an assisting medical professional. This Court declared in Hauseman, supra, that a loaned-servant relationship was conceptually applicable in that setting and, in this appeal, the defendants have accepted and endorsed that position and have presented their arguments predicated on the validity of that proposition. I react solely to the appellate arguments as presented, mindful that this is an "error correction" court, not a court of original jurisdiction, and we are supposed to focus solely on whether the trial court committed error based on the issues and legal principles argued before it by the parties, and, assuming "preservation of error" at the trial stage, based on the arguments thereafter articulated and supported with proper legal authority in the briefs submitted to this Court by the appealing party and in any oral argument convened. No matter how legitimate and compelling a legal principle might be in fact, if it was not properly presented to the trial judge, and thereafter properly presented to this Court, we are obliged to disregard it in assessing whether "error" in the trial court has been shown. I do not believe the majority opinion holds true to these governing rules of appellate review.
Because the majority is the majority, and therefore its holding reversing the trial court's judgment in its entirety and remanding the case for a new trial stands as "the law of the case," I will refrain from commenting on the merits of any of the other issues raised by the defendants, including *577 their various arguments concerning the size of the punitive-damages award.
LYONS, WOODALL, and PARKER, JJ., concur.
NOTES
[1] This case was originally assigned to another Justice; it was reassigned to Justice See.
[2] Timmons initially named two additional defendants: Dr. Wilfred Fontenot and Baptist Health, the owner and operator of the hospital at which Brandi's surgery was performed. On a joint motion by Timmons and the defendants, the trial court dismissed Dr. Fontenot from the case. The trial court later dismissed Baptist Health based on its settlement agreement with Timmons.
[3] The jury awarded Timmons $14.5 million in damages; however, the trial court granted the defendants' motion to reduce the jury verdict by the amount of Timmons's settlement with Baptist Health. See note 2.
[4] Because we hold that the trial court committed reversible error necessitating a new trial in instructing the jury that Dr. Ware is vicariously liable for the acts of Nurse Hayes, we do not address the remaining issues that Dr. Ware, Nurse Hayes, and Anesthesiology & Pain Medicine of Montgomery, P.C., raise on appeal.
[5] American Tennis Courts, Inc. v. Hinton, 378 So.2d 235, 237 (Ala.Civ.App.1979), held that the test for determining the existence of an employer-employee relationship in a workers' compensation case is identical to the test applied under the doctrine of respondeat superior: "The test to be used in determining the relationship of [employee to employer] is whether [the employer] had a reserved right of control over the means and agencies by which the work was done or the result produced. . . ."
[6] The dissent would ignore this language that the court adopted and to which the parties agreed, and would instead rely on a contradictory conclusion that Nurse Hayes was not under the authority of Anesthesiology & Pain Medicine of Montgomery, P.C. 954 So.2d at 576 ("The professional corporation could not direct or supervise Nurse Hayes in the care she provided Brandi.").
[7] Notwithstanding the extensive argument in the dissent about our treatment in this opinion of the loaned-servant doctrine, we do not premise our decision on that doctrine. Dr. Ware first raised a respondeat superior argument. Because that argument is dispositive, we do not reach the argument concerning the loaned-servant doctrine that Dr. Ware later raised.

The loaned-servant doctrine provides:
"When one person puts his servant at the disposal of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former. This rule is elementary and finds support in a large number of decisions. . . . "
Denton v. Yazoo & Mississippi Valley R.R., 284 U.S. 305, 308, 52 S.Ct. 141, 76 L.Ed. 310 (1932) (emphasis added); accord United States Fid. & Guar. Co. v. Russo Corp., 628 So.2d 486, 488 (Ala.1993) ("one in the general employ of one master may with respect to particular work be transferred to the service of a third person in such a way that he becomes for the time being the servant of that person, with all the legal consequences of that relationship"). Both Timmons and Dr. Ware conceded that Nurse Hayes was the servant of Anesthesiology & Pain Medicine of Montgomery, P.C., at the time of Brandi's operation and that the following portion of the trial court's instruction is correct: "[T]he CRNA [Nurse Hayes was] at all times working within the line and scope of [her] employment with Anesthesiology & Pain Medicine of Montgomery, P.C." Thus, there is no basis in the instruction on which this Court could conclude that Nurse Hayes was ever "transferred to the service of a third person" for any period or for any purpose relevant to this case. Moreover, under the language of the instruction Dr. Ware is not a third person but a co-employee of Nurse Hayes's as an employee of Anesthesiology & Pain Medicine of Montgomery, P.C. Thus, the dissent's reliance on Hauseman v. University of Alabama Health Servs. Found., 793 So.2d 730 (Ala.2001), is misplaced, see 793 So.2d at 733 ("`Plaintiff contends that the residents were loaned or borrowed servants and they were working for Dr. Pacifico and not for [the University of Alabama at Birmingham].'" (quoting trial court's order; emphasis added)).
We premise our opinion on Dr. Ware's argument to this Court on appeal that Dr. Ware could not be vicariously liable for the acts of an employee of Anesthesiology & Pain Medicine of Montgomery, P.C., simply because he was her supervisor. The dissent asserts that Dr. Ware and Nurse Hayes's "relationship as co-employees is incidental, and totally irrelevant, to their specific relationship at issue in this case of supervising anesthesiologist and supervised CRNA." 954 So.2d at 576. However, the co-employee relationship simply cannot be irrelevant when, as the trial court instructed, "[b]oth the physician [Dr. Ware] and the CRNA [Nurse Hayes] were at all times working within the line and scope of their employment with Anesthesiology & Pain Medicine of Montgomery, P.C.," and that, for that reason, Anesthesiology & Pain Medicine of Montgomery, P.C., is vicariously liable for Nurse Hayes's actions. The only issue before this Court is the propriety of the trial court's instruction to the jury. In reviewing a trial court's jury instruction for reversible error, this Court is required to "look to the entirety of the trial court's charge." Nelms v. Allied Mills Co., 387 So.2d 152, 155 (Ala.1980). Consequently, the co-employee relationship between Nurse Hayes and Dr. Ware established by the first part of the trial court's instruction  which Timmons submitted to the trial court  is an integral part of any later analysis of Dr. Ware's vicarious liability.
[8] The dissent would distinguish the cited cases. In those cases, an employee of the master retained the tortfeasor ostensibly on behalf of the master. The employee, however, lacked the authority of the master to do so. In the case before us there is no actual employee of Dr. Ware who is alleged to have, on behalf of Dr. Ware, retained Nurse Hayes.

The significance of the fact that in the cited cases the employee did not have the authority of the master to retain another servant is that absent that authority the employee could not have exercised the master's right to choose his servant. Although an actual choice was exercised by an actual employee, the master still was not held liable under the doctrine of respondeat superior because the employee lacked the authority to exercise that choice on behalf of his master. This principle must be even more compelling in a case like the one before us in which not only is there an absence of choice on the part of the purported master, Dr. Ware, but there is also not even a colorable choice exercised by an employee ostensibly on behalf of the purported master.
[9] Restatement (Second) of Agency § 1 (1958) defines an agency relationship, a principal, and an agent as follows:

"(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other act on his behalf and subject to his control, and consent by the other so to act.
"(2) The one for whom the action is to be taken is the principal.
"(3) The one who is to act is the agent."
[10] Restatement (Second) of Agency § 2 cmt. a (1958).
[11] Although the dissent attacks the main opinion for adopting a new test that requires that the purported master have a choice whether to establish a master-servant relationship, the dissent also says with respect to the related loaned-servant doctrine:

"Again, I have no quarrel with this proposition.
"Concerning the right of control, and in otherwise undertaking to state, with purported completeness, the appropriate test for determining whether a servant in the general employ of one party has become, for the time being, the servant of another as special master, this Court has had the following to say:
"`In such a case, the results will be determined by the answer to the questions: whose work was the servant doing and under whose control was he doing it? And it is the reserved right of control rather than the actual exercise that furnished the true test of relationship. He is master who has the supreme choice, control, and direction of the servant and whose will the servant represents in the ultimate result and in all its details.'
"United States Steel Corp. v. Mathews, 261 Ala. 120, 123, 73 So.2d 239, 242 (1954) (citations omitted)."
954 So.2d at 565 (second and third emphasis added).
It is difficult to understand the rule the dissent would have us adopt. Under the dissent's reasoning, the "master" apparently would be bound by the acts of a purported servant he has never hired or otherwise adopted, simply because, without the master's having chosen the servant, this pure volunteer has "agreed" to act for the master. Apparently, there is an exception to this rule where there is an actual servant of the master, and that actual servant agrees  ostensibly on behalf of his actual master  that the purported servant is a servant of the master. In such a case, the purported servant is not a servant of the master unless the actual servant had actual authority to consent to the master-servant relationship on behalf of the master. The dissenting opinion justifies this contortion by the fact that this Court has never before held that the master must have the authority to select the servant; we have, however, held that the servant must have agreed, and we have decided in two cases that a servant who chooses a servant on behalf of the master must have the actual authority to do so.
In fact, it is clear, as we discuss, that the master-servant relationship is founded in mutual consent, and the dissent does not offer a single authority to the contrary.
[12] There is evidence, as the dissent suggests, that would support an argument that only an anesthesiologist, and not a corporation, can have this reserved right of control; however, Timmons not only agreed to, but also advocated, a jury instruction to the effect that Anesthesiology & Pain Medicine of Montgomery, P.C., was acting as the master of both Nurse Hayes and Dr. Ware at the time of Brandi's operation. Thus, Timmons has relied upon and benefited from the contrary proposition that the corporation possessed the reserved right of control.
[13] It is at least in part for this reason that error below does not suggest a shortcoming on the part of the trial judge. The principal function of the appellate courts is to ensure a measure of uniformity in the law, availing themselves of the research, analysis, and debate for which trial courts have neither the resources nor the time.
[*] Court of Civil Appeals Judge William C. Thompson was appointed December 14, 2005, to be a Special Justice in regard to this appeal.